**Frank J. KAEHNI and Marie Kaehni**

v.

**The DIFFRACTION COMPANY, Inc.**

**Civ. A. No. 20693.**

United States District Court,
D. Maryland.

April 28, 1972.

524

Edward I. Stillman, Cleveland, Ohio, and Samuel H. Guth, Baltimore, Md., for plaintiffs.

Benjamin R. Civiletti, Baltimore, Md., and John F. McClellan, Sr., of Timonium, Md., for defendant.

NORTHROP, Chief Judge.

This is an action brought under the Patent Laws of the United States, Title 35 U.S.C., by Frank J. Kaehni and Marie Kaehni, plaintiffs, for infringement of U. S. Letters Patent No. 2,463,280 (hereinafter, "280"), issued March 1, 1949. Jurisdiction of this Court is based on 28 U.S.C. § 1338; venue is not contested.

Plaintiffs contend that defendant, The Diffraction Company, Inc. (hereinafter, "Diffraction") manufactured and sold devices which infringed claims 1 and 4 of Patent 280, which claims read on figure 15 of said patent.

Diffraction admits manufacturing and selling the accused devices but denies that they infringe claims 1 and 4 of 280 as they read on figure 15 of the patent. Diffraction further challenges the validity of Patent 280.

### Facts Leading to This Suit

Plaintiff, Frank J. Kaehni and his brother, William L. Kaehni (who is now deceased and whose interests have passed to their sister, plaintiff Marie Kaehni), have been engaged in scientific research and inventing since the 1920's. Together they claim to have secured approximately 100 patents of various scientific natures. On February 16, 1943, the Kaehni brothers filed a patent application for "Spectroscope Gratings Having Spaced Zones of Diffraction Lines." On May 10, 1946, after numerous rejections and amendments, the ap-plication which included 31 claims was finally rejected by the patent examiner. Rejection was based on the 1895 U.S. Patent of Jacobson (551,769), the 1939 British Patent of Browne, and on the prior publications of Lewis Wright in 1892 and R. W. Wood in 1934. *See,* "Record of Prosecution in the U. S. Patent Office (Patent No. 2,463,280)," which is in evidence in this case as Plaintiffs' Exhibit No. 45.

The inventions and devices involved in this litigation can best be described in lay terms by a brief review of their scientific evolution. Prior to the 1890's it was well-known that striations, or minute grooves, cut very close together (a matter of thousandths of an inch apart) on a fine, regular surface would have the effect of dispersing white light to form a brilliant color spectrum. The effect is known as "diffraction" and the properly prepared surface is known as a "grating." Mother Nature has produced diffraction gratings, for example, on mother-of-pearl. A man-made diffraction grating, it was thought, required that striations be cut in the form of closely-spaced concentric circles, usually by a diamond. The process was obviously quite tedious and expensive.

Wright's 1892 publication described such gratings on transparent bodies or surfaces. Jacobson's 1895 patent described a diffraction grating that could be more economically produced by ruling one continuous, spiral line (as compared to innumerable, separate, concentric lines) on an opaque surface. Kaehni's 31 claims described various spectroscopic gratings on transparent surfaces as well as the methods and instruments used to produce them. The patent examiner felt that Kaehni's claims were unpatentable over Wright, and Jacobson, and a combination of the two, because they were, *inter alia,* the full equivalent of, or obviously disclosed by, one or the other or both. *See* pp. 101–106 of Plaintiffs' Exhibit No. 45.

The Board of Appeals of the Patent Office, in a decision dated November 26, 1947, reversed the examiner's rejection

as to four claims and affirmed as to the remaining claims. The four claims granted were allowed because they employed a plurality of Jacobson-type gratings or grating zones which were to be separated by a predetermined space in order to isolate specific colors or focus on a specific point. This was thought not to be disclosed in or suggested by earlier references. Rejection of the other 27 claims was affirmed because, *inter alia,* they were premised on the advantages of one continuous, spiral line (Jacobson's Patent) and did not involve a plurality of gratings. Kaehni's patent 280, issued March 1, 1949, is in evidence as Plaintiffs' Exhibit No. 34.

Of the four claims allowed in Kaehni's patent, two are at issue here, numbers 1 and 4, which read:

1. A transparent spectroscope grating having separated coaxial circular zones of grating lines of predetermined spacing and a relation to each other and uniformly spaced in each zone, whereby diffracted light rays through one may pass through the other and be observed at a common point.

4. A spectroscope comprising a transparent body having parallel sides, grating lines comprising minute grooves of uniform depth formed in a circular zone on opposite sides and within concentric circular bands, the spacing of lines being such that light diffracted into the body from one band is again diffracted by the second band to a focal point on an axis concentric with both zones.

It is agreed by all parties that these claims read only on figure 15 of the patent.

Testimony at trial disclosed that this patent had never been commercially exploited during the 17 years of Kaehni's monopoly. In 1950, plaintiffs became aware that Edmund Scientific Company of New Jersey was marketing, via catalogue, jewelry which incorporated diffraction gratings. In discussions with his brother, plaintiff had decided that these devices infringed 280

and notified their patent attorney to that effect.

Beginning in 1962, Kaehni corresponded, through a succession of counsel, with Edmund Scientific regarding a possible licensing of 280 and other possible commercial uses, beyond jewelry, for 280 as well as other of Kaehni's inventions. By 1964, Kaehni was communicating with defendant Diffraction, having been advised by Edmund that Diffraction was the manufacturing source.

On March 1, 1966, patent 280 expired. On April 23, 1969, this suit was filed. On the same day, or shortly thereafter, similar suits were filed by Kaehni against various defendants, including Edmund Scientific, who handled Diffraction's accused devices in the marketing chain ending with retailers. A total of nine defendants were named in three different federal district courts. On March 31, 1970, The Judicial Panel on Multidistrict Litigation ordered the nine suits, designated MDL Docket No. 36, consolidated for pretrial and discovery proceedings in this court, pursuant to 28 U.S.C. § 1407. Upon completion of all pretrial proceedings and upon agreement of all counsel, it was decided to proceed to trial with this suit, as the outcome would be dispositive of the questions of validity and infringement. *See* the Supreme Court's recent decision in the case of Blonder-Tongue Lab., Inc. v. University of Illinois Found., 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). Consequently, this suit came to trial on those questions alone, with damages to be determined in separate trials for each suit in the court where suit was originally filed, in the event validity and infringement were established here.

### Infringement

■ The accused devices manufactured by Diffraction are flat discs varying in size from approximately $3/8$ inch to one inch in diameter. The discs are incorporated into jewelry for the ornamental effect of the changing color spectrum they reflect when exposed to ordinary light. The end product is avail-

able in the form of earrings, cuff links, tie clasps, necklaces, bracelets, etc., is inexpensive, and is commonly categorized as "costume jewelry." *See* Plaintiffs' Exhibits 1 through 32.

The reflective discs are diffraction gratings. They are produced by stamping aluminum-coated plastic strips with a die on which has been engraved a continuous spiral striation. Plaintiffs' Exhibit 15, which contains four such impressions, is perhaps the most useful example of the accused devices in this case. Dies used by Diffraction, and, of course, the resultant impressions, contain approximately twelve thousand striations to the linear inch (counting outward from the center of the disc to the outer edge). After the aluminum-coated plastic has been stamped by the die, the entire aluminum film, one-millionth inch "thick," has conformed to the shape of the die, i. e., a diffraction grating; simultaneously the force of the die passing through the aluminum has impressed a diffraction grating on the aluminized side of the plastic substrate. The bottom side of the plastic substrate remains smooth and unaffected by the die.

Thus the major point in issue in this case arises: Does the accused device have, or operate as, *two* diffraction gratings or *one*? If the latter is true, the device cannot possibly infringe as alleged, Kaehni's patent being limited to a plurality of gratings or grating zones.

Needless to say, the Court had the benefit of expert testimony in making this critical, if not dispositive, finding. However, I pause to note that the highly technical, scientific nature of this case was apparent some time ago. Accordingly, it was agreed in a hearing on pretrial motions some two months before trial that a neutral court-appointed expert witness would be retained, with the losing party paying the expense. This procedure was first employed two decades ago in patent litigation involving such questions by the late Judge William

C. Coleman of this Court. The procedure developed by Judge Coleman and used in this case includes prior agreement in principle by all parties, party participation in selection to insure neutrality, advance preparation by the neutral expert, his presence during all of the trial, including access to exhibits, his conducting such out-of-court experiments as he deems necessary, and his testimony at the end of the trial (subject to examination by both parties) wherein he states his findings and conclusions. The Court is not bound by the neutral expert's opinion.

Judge Coleman's practice was published in 1958, at 21 F.R.D. 548, and in 1961 was incorporated into and approved as an alternative procedure by the Handbook of Recommended Procedures for the Trial of Protracted Cases, 25 F.R.D. 351, 421 (1960), which was adopted by the Judicial Conference of the United States in March, 1961.[1] This is a procedure that falls within the discretion of a trial judge and is especially useful "where a fact of a scientific nature can be ascertained with some degree of definiteness by one well-versed in the field." 40 F.R.D. 38 (1967).

The neutral expert agreed upon by the parties to this action was Dr. Carroll O. Alley, Professor of Physics and Optics at Princeton University, The University of Rochester, and presently at the University of Maryland. His credentials are impressive and include, *inter alia,* being head of a team of scientists that designed reflectors (utilizing diffraction principles) which were placed on the moon by Apollo 11. In advance of trial, he studied the patents relevant to the case, including the Kaehni patent prosecution file (Plaintiffs' Exhibit 45); he heard all testimony, examined all exhibits, and on occasion asked questions of witnesses; he conducted experiments at night during the course of the trial; and he testified and was cross-examined by both parties as well as the Court. Dr. Alley did not con-

---

1. In the manual, this procedure is designated "court-appointed expert."

fer with the Court off the record. His testimony will be referred to as this opinion proceeds to the Court's findings.

I now return to consider the question of whether the accused devices operate as one or two diffraction gratings. The uncontroverted, expert, scientific testimony[2] clearly establishes that Diffraction's product operates as only one grating, and this Court so finds.

The reason is apparent and readily grasped. The aluminum coating of the accused devices is only 200 angstroms thick. Dr. Alley's independent tests confirmed that measurement. An angstrom is equal to one ten-billionth of a meter, or one-quarter of a billionth of an inch. Thus, 200 angstroms "thickness" is less than one-millionth inch "thick." By comparison, a single wave length of visible light is from 3,500 to 7,500 angstroms in length, depending on the color.

Dr. Crosswhite testified that a 200 angstrom thickness of an unsupported transparent film is so thin it is invisible. The aluminum film is visible because of the light-scattering effect of the free electrons of the aluminum molecules. The diffraction process, he testified, occurs continuously over some distance as white light passes through a medium (in this case, aluminum). The minimum distance requisite for a double-diffraction effect is one-quarter of a wave length of light, or approximately 1000 angstroms. Thus, he concludes, the accused devices are incapable of producing a double-diffraction result. They operate as, and they are in fact, only one diffraction grating. This Court so finds as a fact.

Kaehni argues that light strikes the leading edge of the aluminum coating and is diffracted. It then passes through the 200 angstrom "thickness" of aluminum and encounters the grating impressed in the plastic substrate, where it is again diffracted. Thus, Kaehni argues that the aluminum film is both the initial diffraction grating *and* the "transparent body" referred to in his patent, which body functions to separate two distinct gratings, or grating zones. By comparison, a device offered by plaintiffs as an example of a "Kaehni grating" (Plaintiffs' Exhibit 37, marked "1100") is roughly ⅛ inch thick, which is equal to approximately 31,250,000 angstroms. Plaintiffs' argument is patently specious, even to the lay mind.

Plaintiffs' argument fared no better with the scientifically-trained minds. Dr. Crosswhite testified that the diffraction process may, in a metaphysical sense, be said to begin at one point and end or recur at another. However, each electron in the aluminum medium acts identically to cause diffraction. The phenomenon occurs continuously as light passes through the medium; it cannot be said that the electrons on the front and back surfaces of aluminum are functioning independently or differently. He concludes that a 200-angstrom thickness does not provide sufficient separation to permit the grating on top of the aluminum film and the grating beneath it to operate as two diffraction gratings. Dr. Alley likewise testified that the 200-angstrom separation was insufficient to permit double diffraction. Plaintiffs produced no expert testimony to the contrary. Even Mr. Kaehni's testimony did not offer a theory to refute that upon which the scientific experts' finding, as well as the Court's finding, are based.

Another major obstacle rises up to defeat Kaehni's allegation of infringement. Patent 280 expressly deals exclusively with *transparent* gratings. This was made necessary by the existence of the

2. Only Dr. Alley and Diffraction's expert, Dr. Henry M. Crosswhite, Jr., a Professor of Physics and Spectroscopy at The Johns Hopkins University, were offered and accepted as scientific expert witnesses. Kaehni's expert, Charles R. Rust, Esquire, was qualified only as an ex-pert on patent law. Both Remson Wood (owner of Diffraction) and Frank J. Kaehni testified, but neither were offered as experts. Mr. Kaehni's testimony conflicted with the opinions offered by the experts and is weighed by the Court according to the qualifications presented.

Jacobson patent which described continuous, spiral lines on an opaque body. Thus 280 is operative only where two transparent diffraction gratings operate as a "transmission device."

Plaintiff's indefatigable and imaginative resourcefulness, evidenced by his inventive nature and supported by the many patents he holds, was proved beyond doubt once again by the arguments proffered the Court on this point. Aluminum, Mr. Kaehni argues, is transparent. More accurately, Kaehni maintains that the accused devices are transparent. Transparency is measured by the ability of the medium to transmit light. Window glass, for example, has roughly a 90% transmission factor, the remainder being either reflected or absorbed. The accused devices have a 3–4% transmission factor, he asserts, and this is sufficient to place them within the generic definition of "transparent."

After the sound of fluttering fingers dancing through dictionaries had filled the courtroom, it was established and agreed that in order to be transparent, a body must permit sufficient transmission of light so as to make objects on the other side "clearly" visible.

With the dictionaries silenced, plaintiffs proceeded to plunge the courtroom into darkness in order to prove their point. (But then, this Court has operated in darkness before.) With all the lights out, and with an accused device (Plaintiffs' Exhibit 15) held immediately in front of the eye, the windows of the courtroom (through which the clear light of day was pouring) were visible indeed, though detail was not "clearly" discernible. At this point I should like to comment that I would never have aluminum coating applied to my spectacles or to the window glass in my house.

The demonstration dazzled the eye and the judicial mind as well. However, through expert testimony the clear light of reason was shed upon this perplexing phenomenon. In the infinite metaphysical sense, no medium is entirely a transmission device, or entirely a reflective device. It follows that nothing is entirely transparent or entirely opaque. The accused devices could be described in lay terminology as "transparent," although Dr. Crosswhite testified that the term enjoys no scientific efficacy.

The Jacobson patent creates a "reflective device." Transmission of light is not a function of such a device, though it may be an unavoidable occurrence to an insignificant degree. In order to avoid the Jacobson patent, the Kaehni patent had to be a transparent, transmission device, not an opaque, reflection device. Dr. Alley testified that his independent tests established an 89% reflection rate and a 2% transmission rate for the accused devices. However, he said, transmission is not a factor in the functioning of the accused devices—they are reflective devices falling within Jacobson's description, not Kaehni's.

Dr. Crosswhite testified that aluminum is a "scattering medium" as compared to a "transparent medium" and that notwithstanding a 2% transmission factor, the accused devices are not transparent in the optical sense. Based on the unanimous scientific expert testimony, this Court finds as a fact that the accused devices are not transparent and they do not function as transmission devices.

The conclusions of law regarding alleged infringement follow unavoidably from the fact findings hereinabove stated. Plaintiffs concede that Patent 280 covers only transparent transmission devices employing two diffraction gratings or grating zones. The terms of 280, to that extent, are clear. Claim 1 describes "a transparent spectroscope grating"; Claim 4 describes "a transparent body." Claim 1 describes a "grating having separated coaxial circular zones of grating lines"; Claim 4 describes "a transparent body having parallel sides, grating lines . . . on opposite sides."

While the terms of Claims 1 and 4 of the patent may be difficult to understand in their entirety, the indispensibility to infringement of the factors of

transparency and multiple gratings are made clear by the terms of the patent and by Figure 15 of the patent (the only figure upon which the claims allowed may read). At Column 1, lines 1 through 5 of the patent it is stated:

This invention relates to a new form of spectrum gratings commonly called diffraction gratings, and *the essential objects include producing such a grating upon surfaces of transparent* bodies. [Plaintiffs' Exhibit 34.] [Emphasis supplied].

Figure 15 is described in the patent, at column 3, lines 26, 27 thusly:

Fig. 15 is a sectional view showing *gratings on opposite faces of the transparent block.* [Emphasis supplied].

The same figure is further described at column 7, lines 20 through 25:

Fig. 15 shows *grating zones on the opposite sides of a paralleled sided block* and the light effects from a given source assume very definite contrasts as a result of change of distance from the light of the gratings affording means of measuring distance or small angle differences. [Emphasis supplied].

Plaintiffs' expert witness, a patent attorney not qualified as a scientific expert, testified that the accused devices "read on" claims 1 and 4 of Patent 280, and are substantially identical as well. Those conclusions are entirely untenable in light of the terms of the Kaehni patent and this Court's findings of fact. The accused devices, being neither transparent nor transmission devices, and functioning as only one diffraction grating, do not, as a matter of law, infringe plaintiff Kaehni's Patent 280, and this Court so concludes.

### Validity of 280

Only claims 1 and 4 are before the Court on the question of validity. Both of these claims describe a "spectroscope." Dr. Crosswhite testified that a spectroscope is a device for making visual measurements on the light spectrum. The device is used for observing light sources. He further testified that Kaehni's devices (as well as Diffraction's) were incapable of functioning in that manner for several reasons. Most significantly, the grooves on the devices before the Court are evenly spaced; in order to make measurements or focus on a single point, the grooves would have to be geometrically spaced. Second, the devices focus toward the axis and the device contains no reference or scale. There were additional reasons offered which, quite candidly, escaped the Court's comprehension.

On cross-examination by plaintiffs, Dr. Crosswhite conceded that, theoretically, if light approached a transparent body from opposite directions and passed through diffraction gratings on opposite sides of that transparent body, it was possible that the interaction of light within the body might behave in some unique manner, based on a double diffraction theory. He could not say that plaintiffs' device and method, as described in Claims 1 and 4 of 280, were completely incapable of performing some useful function, though that function remains unidentified by plaintiffs.

An idea in the abstract not reflected by some identifiable, useful result is not properly the subject of a patent. The evidence produced at trial appears to leave the plaintiffs with only an abstract idea. It is noteworthy that the idea which survived is not premised on the principle of transmitting light in the same direction through both diffraction gratings and focusing the light at some common point beyond both gratings, which is the apparent basis of Claims 1 and 4 as they read on Figure 15. Moreover, the expert testimony that the claims as described in the patent can not function as a spectroscope remains unrebutted.

The Court is impressed from the totality of scientific testimony that Claims 1 and 4 of 280 could be invalid for the above-stated reasons.

However, the Court is not going to make a finding of invalidity for the fol-

lowing reasons: The Court is not satisfied that sufficient evidence has been offered, or that the available evidence is sufficiently clear, to support such a finding. The extreme narrowness of the claims granted in 280 is such as to make a finding of invalidity most difficult. The patent expired over six years ago and was never commercially exploited by Kaehni during its efficacy. Only two of the patent's four claims are before the Court. And finally, a determination of invalidity is not necessary to a decision of this case since there is clearly no infringement.

### Costs and Attorneys' Fees

■ In its original Answer and Counterclaim filed July 11, 1969, in response to this suit, Diffraction asked for, *inter alia*, an award of costs and reasonable attorneys' fees. After the pretrial conference of October 19, 1971, which plaintiffs' counsel failed to attend, and as a result of which the Court indicated it would entertain motions of defendants to dismiss, Diffraction again moved for an award of costs and attorneys' fees. The motions to dismiss, as well as all remaining pretrial motions were heard and decided on January 28, 1972. In its Order filed February 3, 1972, denying the motions to dismiss, this Court stated:

IT IS FURTHER ORDERED, that the Court, at the conclusion of the trial on the issue of infringement in the event there is a finding of no infringement, will entertain Motions from the Defendants for costs and for attorneys' fees under Title 35 U.S.C. § 285.

In the Pretrial Order submitted to and signed by the Court on March 27, 1972, Diffraction articulated in full its facts and arguments in support of an award of attorneys' fees. At the trial of this case, in its closing argument, Diffraction again addressed itself to the propriety of an award of attorneys' fees pursuant to 35 U.S.C. § 285. Therefore, it should come as no surprise now that the Court considers an award of fees.

Testimony at trial establishes the following history of this case, which the Court finds as fact. After a lengthy and vigorous prosecution of his patent application, Kaehni was finally awarded four claims under 280. As is obvious from the examiner's rejection and the Appeal Board's grant, the claims were narrowly limited to multiple gratings on transparent bodies, because of the prior art generally, and the Jacobson patent specifically.

In 1950 plaintiffs first suspected 280 might be infringed by the accused devices in this case. Twelve years later, and for the first time, plaintiffs initiated an inquiry to Edmund Scientific. By 1964, plaintiffs were communicating with Diffraction. In 1966 Patent 280 expired, and over three years later, plaintiffs filed suit. There is no testimonial or documentary evidence offered of any correspondence between the parties or their attorneys during the five years between the last letter in June, 1964, and the filing of this suit in April, 1969.

Uncontroverted testimony discloses that shortly after suit was filed against Edmund Scientific, Mr. Edmund called Mr. Remsen Wood of Diffraction seeking assurance regarding defense of the suit. This was Mr. Wood's first notice that suit had been filed. Mr. Wood promptly called Kaehni and attempted, with reference particularly to the letter of June 25, 1964 (Defendant's Exhibit No. 12), to persuade Mr. Kaehni that an infringement suit was frivolous. Mr. Kaehni's sole reply was that he had been instructed by counsel not to discuss the suit. Accordingly, on May 28, 1969, Mr. Wood wrote plaintiffs' counsel and supplied a full explanation of the Diffraction devices, with actual gratings attached as exhibits, the method of manufacture, a full explanation of the Kaehni and Jacobson patents, and a complete explanation of the generic differences between Kaehni's patent and Diffraction's products regarding the critical differences of transparency and multiple diffraction gratings. This letter is in evidence as Plaintiffs' Exhibit No. 35.

There is no evidence that Mr. Kaehni, or any diffraction expert on his behalf,

ever tested the samples provided by Mr. Wood, or any other alleged infringing devices for that matter. In fact, Mr. Kaehni testified that he had not examined his own patent (280) before he filed suit, nor had he examined it for the six year period prior to filing suit. Mr. Kaehni also testified that he had not sought or received advice of a patent attorney during the preparation and filing of this suit and the eight other suits in MDL #36.

Thus began the arduous and prolonged discovery and pre-trial proceedings of this case. Not atypical of this type litigation, the proceedings were frequently punctuated with delays, failures to make timely filings and responses, evasive answers to interrogatories and requests for admissions, and innumerable scheduling conflicts and postponements. No party emerged from this ordeal with "clean hands." However, the singularly atypical feature of the discovery portion of this case was plaintiffs' continuous and complete failure to make a substantively meaningful showing of grounds for its infringement allegation. Plaintiffs proceeded on the barest minimum of allegations sufficient to keep factual issues alive and avoid the numerous motions for dismissal and summary judgment. The eccentricities of federal pleading generally, and patent law particularly, permitted this case to survive three years of discovery and proceed to trial.

The Court has characterized as atypical the plaintiffs' responses as to the substance of infringement. That conclusion is reached after a careful examination of the relevant interrogatories, requests for admissions, and responses thereto by both parties. They may be summarized as follows: Plaintiffs' discovery was directed almost exclusively at matters relating to damages. No requests for sample products or methods of manufacture and specifications were ever made. Apparently, plaintiffs were satisfied with Diffraction's voluntary submissions, most notably Plaintiffs' Exhibit No. 35.

Diffraction's interrogatories, as might be expected, were directed almost exclusively at infringement. Specifically, Diffraction queried plaintiffs' understanding of the physical characteristics (re transparency *vel non* and plurality of gratings) of Diffraction's products and the Jacobson and Kaehni patents. *See,* "Interrogatories of Defendant Diffraction Company Submitted to Plaintiffs Kaehni," Question No. 26(a), filed July 11, 1969; "Defendant's Interrogatories, Second Set," Question No. 8, filed November 14, 1969. In response, plaintiffs steadfastly maintained that the accused devices were transparent and had diffraction gratings impressed both on the aluminum coating on top *and* on the bottom side of the plastic substrate (a position plaintiffs completely abandoned at trial). *See,* "Plaintiffs' Answers to Defendant's Interrogatories," Answer 26 (a), filed August 20, 1969; "Plaintiffs' Answers to Defendant's Second Set of Interrogatories," Answer 8, filed February 10, 1970. I must note at this point that throughout these discovery proceedings, plaintiffs had the samples attached to Plaintiffs' Exhibit No. 35 in possession and that those samples quite clearly had not been impressed on the bottom with an additional grating. While this is evident to the untrained eye, it is undoubtedly obvious to a trained eye and conclusive upon even a modicum of rudimentary investigation. Yet Mr. Kaehni, himself an authority in such matters, continued to press the allegations.

Diffraction's requests for admissions are more telling. As a result of Diffraction's first "Request for Admission," Request No. 4, filed January 12, 1970, plaintiffs admitted they had no claim against Diffraction if their devices "had grating lines only on one side of the body having the rulings thereon, without any separated coaxial or concentric zones." *See,* "Plaintiffs' Response to Request for Admission," filed February 10, 1970. As noted above, even a most superficial analysis of the samples provided plaintiffs would have disclosed to plaintiffs the absence of a separate granting on the back of the accused devices and would thus have eliminated the "genuine" issue

of material fact in accordance with plaintiffs' own admission, *supra*.

We now come to the most forceful, single episode in this improvident chain of events. As these documents are in evidence in the case, they will not be described at length here. In summary, Diffraction's second Request for Admission, filed February 12, 1970 (Defendant's Exhibit 13), amounts to a textbook of instruction in the production of "Kaehni" gratings, "Jacobson" gratings, and the accused devices. It includes eight sample gratings complete with full explanations of their origins and differences in the critical areas of transparency and plurality of gratings. Plaintiffs' response (Defendant's Exhibit 14), filed August 7, 1970, is woeful indeed. It states simply, "Plaintiffs deny request[s] No. 1 [through 7] in that the facts upon which the request is based are primarily within defendant's knowledge and control." That statement goes completely without support in fact and in the record. Moreover, in order for the foregoing statement to be completely candid, one would have to believe that Diffraction knows more about "Kaehni" gratings and Patent 280 than does the inventor himself, Plaintiff Frank Kaehni. Mr. Kaehni testified that he has lived in the same house for fifty years and that his workshop, where he and his brother (while living) had done the majority of their experimenting, inventing and developing, is in the basement of that house. Plaintiff further testified that he continues to this day to be active in his workshop. Considering Defendant's Exhibit 13, plaintiff had everything at his disposal *except* the inclination to verify Diffraction's assertions. He failed to do so and continued to press his claim.

At some point after this last response and before trial, plaintiff abandoned his argument that the accused devices had an additional grating impressed on the bottom of the plastic. The only theory offered at trial was the new argument that the grating simultaneously impressed on *top* of the plastic substrate was the second grating and that the one-millionth-inch thick aluminum coating was the "transparent" body that separated the two. Frankly, this theory is as thin as the aluminum coating that supports it. The infringement question in this case is by no means close; nor is it even substantial. The outcome on this issue, if such things can be quantified, is a "sure thing" if ever that exists in the law. There is not the slightest hint of infringement, and plaintiffs' allegations are completely groundless. There is no evidence that Mr. Kaehni ever conducted, or caused to be conducted, any tests to determine the nature of Diffraction's devices or the existence *vel non* of infringement.

With the factual background established hereinabove, the Court now turns to Title 35 U.S.C. § 285, which today provides:

> The court in exceptional cases may award reasonable attorney fees to the prevailing party.

Prior to 1946, there was no provision in patent law for the award of attorneys' fees. By an act amending Revised Statutes 4921 (U.S.C.A., Title 35, Patents, Sec. 70), Congress, in 1946, added the following:

> The court may in its discretion award reasonable attorney's fees to the prevailing party upon the entry of judgment on any patent case. [U.S.Code Cong.Serv.1946, p. 74].

The intent of Congress is made clear by Senate Report No. 1503, June 14, 1946, which states:

> It is not contemplated that the recovery of attorney's fees will become an ordinary thing in patent suits, but the discretion given the court in this respect, in addition to the present discretion to award triple damages, will discourage infringement of a patent by anyone thinking that all he would be required to pay if he loses the suit would be a royalty. *The provision is also made general so as to enable the court to prevent a gross injustice to an alleged infringer*. [U.S.Code Cong.

Serv.1946, p. 1387] [Emphasis supplied].

Thus, Congress made the provision "general"; it was not meant to apply only in favor of plaintiff-patentees or only in favor of alleged infringers. It was not meant to apply solely in situations where infringement had been intentional or in situations where a patentee had acted fraudulently.

The courts, interpreting the new provision, evolved the following standard:

> The exercise of discretion in favor of the allowance of attorney's fees should have its source in unfairness or bad faith on the part of the losing party, or in some other equitable consideration such as vexatious or wholly unjustified litigation which makes it grossly unjust for the prevailing party in the particular case to bear the burden of his own counsel fees. [Citations omitted]. [Merrill v. Builders Ornamental Iron Co., 197 F.2d 16, 25 (10th Cir.1952).]

This standard was applied in light of the caveat that the award is not to be made "as a matter of course in the ordinary patent suit," nor "as a penalty for failing to prevail." *Id.* at 25. Significantly, the test remained "general"; the judicial approach was one of equity.

Congress amended the provision in 1952 to add the "exceptional case" requirement. On that occasion the report of the Senate Committee on the Judiciary stated:

> . . . '[I]n exceptional cases' has been added as expressing the intention of the present statute *as shown by its legislative history and as interpreted by the courts.* [U.S.Code Cong. and Admin.News, 1952, p. 2423] [Emphasis supplied].

The post-amendment standard has continued the old standard virtually without change:

> The exercise of discretion in favor of an allowance of attorneys' fees should be based upon a finding of unfairness or bad faith in the conduct of the losing party, or some other equitable consideration of equal force, which makes it grossly unjust that the prevailing party be left to bear the burden of his own counsel fees. [Citations omitted]. [Purer & Company v. Aktiebolaget Addo, 410 F.2d 871, 880 (9th Cir.), cert. denied, 396 U.S. 834, 90 S.Ct. 90, 24 L.Ed.2d 84 (1969).]

The "exceptional" label has proved to be no more than a label, which is in accord with Congress' intent.

What type of cases may be said to fall within the "exceptional" category?

> "[E]xceptional circumstances have been interpreted as incorporating concepts of fraud, malice, bad faith and other similar concepts, . . . .."

The cases that have spoken to this question indicate that for an award of attorneys' fees to be upheld the trial court must have found unfairness, bad faith or inequitable or unconscionable conduct on the part of the losing party. [Citations omitted]. [Uniflow Manufacturing Co. v. King-Seeley Thermos Co., 428 F.2d 335, 341 (6th Cir.), cert. denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970).]

The courts have spun off several theories in decided cases of the circumstances which constitute the requisite "unfairness" or "bad faith." Most common are those in which the patent has been knowingly, intentionally infringed, and those in which the patent was originally obtained by fraud. Another example is a plaintiff-patentee prosecuting on the basis of an obviously invalid patent. This Court's search has disclosed no case or rule of law which requires that a patent be held invalid before the alleged infringer is properly awarded attorneys' fees. Nor does § 285 or its history create such a requirement. No court holding or rule of law prohibits declaring a case "exceptional" and awarding attorneys' fees on the ground that the allegation of infringement is frivolous and/or brought without reasonable care. Conversely, no case law supports such a proposition, although some cases have hinted at its propriety.

■ Although the question presented by the facts of this case is novel to that extent, the principle underlying the provision of § 285 makes it clear that a case can be "exceptional" on the basis of such conduct, provided the facts show the plaintiff-patentee's conduct to be sufficiently "vexatious or wholly unjustified." The invalidity of the patent asserted is but one type of proof that the patentee has so conducted the litigation. If qualitatively the plaintiff has acted unjustifiedly, and if quantitatively his conduct makes it unconscionable for the alleged infringer to bear his own attorneys' fees, the terms of § 285 have been satisfied.

■ This Court now holds that a case can be "exceptional" within the meaning of § 285 where the allegation of infringement is frivolous and/or asserted without reasonable care and sufficient justification. A similar holding appears in principle in Wood Products Development Co. v. Cloud Oak Flooring Co., 267 F. Supp. 193, 248 (W.D.Mo.1966):

> In regard to the Red patent, the record specifically shows that at the pre-litigation Springfield meeting, counsel for the Defendants specifically pointed out how the Red patent's claims were limited to the provision of opposed pairs of resilient strips and means on opposite sides of the machine to adjust those strips to effect the radius of curvature—an arrangement which is not present in the machines— and that he "implored" counsel for the Plaintiff to at least simplify the controversy to the extent of withdrawing the infringement of this patent. Under these circumstances, the invocation of the Red patent by the Plaintiff and maintaining this patent in suit for 21 months, and indeed until after the formal opening of the trial, placed a completely unnecessary and unwarranted burden upon the Defendants, which cannot in any way be justified by an argument that the question of infringement was close enough as to be a matter upon which informed reasonable counsel might differ, the Defendants are entitled to an award of their

reasonable attorneys' fees and disbursements for preparing for trial on the patent.

*See also* Ellipse Corp. v. Ford Motor Co., 452 F.2d 163 (7th Cir. 1971), which agrees in principle but holds the facts insufficient to support an award. Interestingly, that case permitted an award of fees to the prevailing defendant (alleged infringer) for fees attributable to a portion of the complaint which was dropped by the plaintiff before trial. *Id.* at 172.

I referred earlier to a category of cases which holds obvious invalidity of a patent sufficient to invoke § 285. The analogy to obvious lack of infringement seems to me a strong one. The line of cases I refer to holds:

> . . . [W]hen the invalidity of a patent is so obvious that anyone skilled in the art, and any competent patent attorney, must have recognized prior to trial that the patent was invalid, the patent action is prosecuted in bad faith and the defendant may be entitled to attorneys' fees under 35 U.S.C. § 285. [Dole Valve Co. v. Perfection Bar Equipment, Inc., 318 F. Supp. 122, 124 (N.D.Ill.1970).]

*See also* Talon, Inc v. Union Slide Fastener, Inc., 266 F.2d 731 (9th Cir. 1959); Stock Equipment Co. v. Beaumont Birch Co., 140 U.S.P.Q. 134 (E.D.Pa.1963). A similar rule was succinctly stated in a recent New York decision:

> It is established in this District that only where the court is convinced that the patent in suit is so wholly devoid of substance that the plaintiff could not have had a bona fide belief in its validity shall it award the defendant reasonable attorneys' fees pursuant to 35 U.S.C. § 285. [Citations omitted]. [Indiana General Corp. v. Krystinel Corp., 297 F.Supp. 427, 449 (S.D.N.Y.1969).]

The obvious-invalidity basis for declaring a case "exceptional" was also recognized in this Circuit in the case of Tidewater Patent Development Co., Inc. v. Kitchen, 371 F.2d 1004 (4th Cir.), cert.

denied, 389 U.S. 821, 88 S.Ct. 46, 19 L.Ed.2d 74 (1967).

■ It is noteworthy that a presumption of validity attaches to a patent issued by the United States Patent Office. This would tend to bolster the belief of the patentee contemplating an infringement suit and lend credence to the claim of validity.

No such presumption attaches to an allegation of infringement; no outside, impartial opinion substantiates the patentee-plaintiff's opinion. Therefore, if obvious invalidity can serve as an indication of bad faith, the obvious absence of infringement should serve even more forcefully to indicate bad faith.

Thus, I reach the pivotal question in the determination, within this Court's discretion, of the propriety of awarding attorneys' fees. Can *this* case be brought within the "exceptional" category because the allegation of infringement has not been advanced with reasonable care or was frivolous?

■ The Federal Rules of Civil Procedure permit minimal pleadings, and a complaint will survive motions to dismiss and summary judgment so long as the plaintiff has salvaged a single "genuine issue as to any material fact." In patent cases the issue of infringement is not such as can be ferreted out as frivolous without going into a detailed investigation which would tend to defeat the purposes of the federal rules. The parties must be trusted to act responsibly. *See* Fed.R.Civ.P. 11.

■ An award of attorneys' fees is within the sound discretion of the trial court, and is only to be made where the trial court's specific findings bring the case within the "exceptional" definition. Uniflow Manufacturing Co. v. King-Seeley Thermos Co., *supra*, 428 F.2d at 341. Based on the following findings, I conclude that this case is "exceptional" and that reasonable costs and attorneys' fees are hereby awarded to defendant Diffraction:

1. The infringement question in this case is not close enough as to be a matter upon which informed, reasonable counsel might differ; nor is it close enough as to be a matter upon which scientifically-informed, reasonable men might differ.

2. Plaintiffs failed to use reasonable care in assessing their infringement allegation prior to bringing suit against Diffraction.

3. Plaintiffs failed to use reasonable care, and failed to act responsibly, when they failed to examine and test the accused devices provided by Diffraction. Plaintiff, Frank J. Kaehni, had both the expertise and the facilities in his home to conduct tests which would have disclosed the absence of infringement.

4. As of May 28, 1969, and by virtue of Plaintiffs' Exhibit 35, plaintiff, Frank J. Kaehni, had in his possession sufficient information and samples to discover the absence of infringement. His failure to do so deprived plaintiffs of the good faith with which they would normally be cloaked.

5. Plaintiffs' complete lack of candor in answering interrogatories and requests for admission (specifically Diffraction's Second Request for Admission) was such as to render their subsequent conduct in bad faith.

6. Plaintiffs' conduct throughout the entire history of this case can only be characterized as vexatious and wholly unjustified in light of their lack of candor and failure to conduct tests and discover the absence of infringement.

7. Defendant Diffraction has, throughout the history of this case, done everything in its power to end the litigation and avoid its enormous cost, and, in light of plaintiffs' wholly unjustified conduct, it would be unconscionable and "grossly unjust" to now require Diffraction to bear the burden of that cost.

There are additional factors disclosed by the facts of this case which, though perhaps not properly an integral part of the determination to award attorneys' fees are nonetheless stated here because they "feed back" to support the outcome. As a result of the nature of the patent application prosecuted by plain-

tiffs, they were aware of the narrowness of the claims granted, specifically in relation to the Jacobson patent and other references listed in 280. Plaintiffs never commercially exploited the monopoly granted in 280. Plaintiffs' delay in bringing suit (some nineteen years after plaintiffs suspected infringement) cannot be considered timely prosecution. The prolonged discovery and pretrial proceedings in this case, at the least, suggest that plaintiffs' true purpose was harassment of the nine defendants (of MDL No. 36). Finally, plaintiffs failed to produce at trial a scientific expert to testify in support of their theory of infringement, and indeed, in support of the validity of Claims 1 and 4 of 280.

■ The Court notes that it must distinguish between overzealous clients and overzealous counsel, for § 285 is directed only at the former. Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp., 407 F.2d 288 (9th Cir. 1969). Therefore, it is appropriate for the Court at this time to reiterate and make clear the fact that it is the conduct of the plaintiff, Frank J. Kaehni, which provides the basis for the findings and conclusions regarding attorneys' fees. Moreover, *Monolith, supra,* holds that where a case is "exceptional" for proper reasons, prolongation of the case even if resulting from counsel's conduct, is properly considered in determining the amount of fees to be awarded.

In accordance with the findings and conclusions hereinabove stated, it is the determination of this Court that Diffraction be awarded costs and reasonable attorneys' fees resulting from this litigation from May 28, 1969 (the date of Plaintiffs' Exhibit 35) up to the present.

■ The question now arises as to that portion of Diffraction's efforts aimed at the defense of invalidity. A similar situation arose in Talon, Inc. v. Union Slide Fastener, Inc., *supra,* wherein that Court stated, 266 F.2d at 740:

> In our view, such award to a defendant may include services rendered by his attorney in connection with a separate defense set forth in the answer even though the trial court should ultimately conclude that such defense had not been sustained; provided that such defendant prevails in the action and that such defense was relevant and material, and was asserted and maintained in good faith.

I find this argument most persuasive, and most definitely applicable to the facts of this case. Certainly, Diffraction has met all of the criteria set out, and indeed, has as much as prevailed to the same extent as if it had been successful on the issue of validity. I therefore conclude that Diffraction is entitled to all of its reasonable costs and attorneys' fees in this action, since the only issues involved before and during trial were those of validity and infringement.

As the Court is not presently in possession of sufficient information to make a specific award, Diffraction is hereby ordered to submit to the Court, with a copy to plaintiffs, a proposed Order of Court in this connection. Plaintiffs will be permitted to respond, and a hearing will be granted, if requested.

### *Expenses on Failure to Admit*

■ As an alternative to award of fees pursuant to 35 U.S.C. § 285, Diffraction has moved under Fed.R.Civ.P. 37(c), for an order requiring plaintiffs to pay the reasonable expenses, including attorneys' fees, incurred in proving the truth of the matters contained in Diffraction's Second Request for Admission (Defendant's Exhibit 13), filed February 12, 1970, which matters plaintiffs failed to admit in their Response (Defendant's Exhibit 14), filed August 7, 1970.

These documents were fully discussed in the preceding section of this opinion, and the Court's findings and conclusions were set out in full, *supra,* all of which the Court now incorporates herein by reference. In addition, the Court now

**538**

finds that Diffraction's Request was not held objectionable pursuant to Rule 36 (a); the admissions sought therein were of substantial importance, indeed, they were dispositive of the entire case; plaintiffs had no reasonable ground to believe they might prevail on the matters, or if they did, those reasons were not apparent from plaintiffs' wholly irresponsible response that the facts were primarily within Diffraction's knowledge and control; and finally, there was no other good reason for plaintiffs' failure to admit.

A careful examination of Diffraction's Request (Defendant's Exhibit 13) discloses that questions numbered 2 and 3 are exhaustive of the transparency and multiple grating issues. Inasmuch as these two issues constituted Diffraction's entire defense of the suit, and insofar as plaintiffs' failure to admit was irresponsible and inexcusable, the Court concludes, as an alternative to the holding regarding attorneys' fees, *supra,* that plaintiffs shall be required to pay to Diffraction the reasonable costs and attorneys' fees incurred as a result of plaintiffs' failure to admit the matters contained in Diffraction's Second Request for Admission, filed February 12, 1970. All reasonable costs and fees related to the infringement portion of this suit are to be included. Diffraction is hereby ordered to file a schedule of costs in accordance with this alternative holding. Plaintiffs may respond accordingly, and this matter will be heard together with the proposed Order for all costs and fees requested, *supra.*

In summary, this Court concludes that plaintiffs' Patent 280 is not infringed by the accused devices of Diffraction. The Court declines to rule on the question of validity of 280. Reasonable costs and attorneys' fees are awarded to Diffraction pursuant to 35 U.S.C. § 285. In the alternative, Diffraction is awarded its expenses due to plaintiffs' failure to admit. Counsel are directed to submit a final Order of Judgment in accordance with this opinion.