MULTI–TECH, INC., Plaintiff,

v.

COMPONENTS, INC., Defendant.

Civ. A. No. 87–418 JRR.

United States District Court,
D. Delaware.

March 20, 1989.

**616**

John W. Noble, Dover, Del. (Thomas T. Alspach of Earnest & Cowdrey, Easton, Md., of counsel), for plaintiff.

Richard H. Morse of Young Conaway, Stargatt & Taylor, Wilmington, Del. (Lars I. Kulleseid, and Ron E. Shulman of Fish & Neave, New York City, Alfred L. Michaelsen and Walter S. Zebrowski of Corning Glass Works Patent Dept., Corning, N.Y., of counsel), for defendant.

## OPINION

ROTH, District Judge.

On August 5, 1988, following briefing and oral argument, we granted the defendant's motion for summary judgment of noninfringement of Multi–Tech's U.S. Patent No. 3,775,527 (the "'527 patent"). Final Judgment was entered on September 13, 1988, dismissing the plaintiff's claims with prejudice. Two motions are presently before the Court. The first motion is Components's motion, made pursuant to 35 U.S. C. section 285 and Local Rule 6.3, for an award of attorneys' fees and expenses incurred in defense of this action. The plaintiff filed the second motion for permission to file a supplemental memorandum in support of its opposition to the defendant's motion for fees.

## I. FACTS

The plaintiff instituted this suit against the defendant on August 4, 1987, alleging that the defendant was infringing its '527 patent by producing plastic jackets for encasing small electrical components, such as capacitors. In its answer the defendant admitted that it produced capacitor jackets, but denied that its activity was infringing the '527 patent. At that time, the defendant also filed a counterclaim seeking a declaratory judgment and, among other forms of relief, an award of costs, expenses, and attorneys' fees.

The '527 patent as issued is comprised of seven claims. When first presented to the Patent and Trademark Office (the "PTO"), Multi–Tech's patent application contained eight claims. These claims were rejected initially as being unpatentable in light of the prior art, namely, the Haroldson Patent, U.S. Patent No. 2,964,065. In response to the PTO's action, Multi–Tech resubmitted its application, modifying it by deleting three of its claims, amending three other claims, and adding three new claims. These claims were once again rejected by the PTO. Multi–Tech submitted the claims for a third time, deleting one claim, amending two others, and amending the specification. These claims were finally held to be patentable by the PTO.

During its second submission, Multi–Tech was careful to distinguish thermosettable (or thermoset) materials from thermoplastic materials and to explain why thermosettable materials were required to obtain the desired result in fabricating the jackets. Specifically, Multi–Tech's patent attorney, set out in the "Remarks" section:

It is initially noted that the invention of this application relates to a method of providing accurately dimensioned jackets formed of thermoset material for electrical components such as capacitors and the like. It is imperative that the jackets, which may be extremely small, be accurately dimensioned with respect to both thickness and to length since any dimensional variations can result in unacceptable electrical variations of the finished component.

Electrical component jackets of the foregoing type are manufactured of thermoset material since such material is dimensionally stable and relatively unaffected by subsequent heat in the environment in which the component is employed. It should be noted that *thermoset materials are, by definition, those materials which solidify or set upon heating and cannot be remelted.* Ther-

moset products cannot be reshaped once they have been fully cured and set.

.    .    .    .    .

*... Thermosplastic materials by definition are those materials that can be set by heat but regain their original properties upon cooling.*

Jan. 23, 1973, Response to PTO Action at 3–5, Appendix to Defendant's Motion for Summary Judgment at A44–46 (D.I. 30A) (emphasis added).

According to Multi–Tech, the Haroldson patent was concerned solely with thermoplastic materials whereas Multi–Tech's invention covered only thermoset materials. As the plaintiff further stated in this January 23, 1973, submission to the PTO:

Specifically, Haroldson, et al discloses the formation of polytetrafluoroethylene tubing for use as a terminal sleeve as illustrated in Figure 6 of the drawings of the patent. The polytetrafluoroethylene tubing is not a thermoset or thermosettable material, but it is the exact opposite in that such material is *thermoplastic.*

.    .    .    .    .

As was noted above, Haroldson et al does not disclose the formation of a jacket formed of thermoset material. The physical characteristics and nature of the thermoplastic material of the type employed in Haroldson are entirely different from those of thermoset materials. Consequently, a person seeking the solution to problems involving thermoset materials would neither seek not find such solutions in the thermoplastic art as exemplified by the Haroldson, et al patent.

*Id.* at A45–47.

Therefore, attempting to distinguish its invention from the prior art, Multi–Tech

submitted each claim to the PTO as one which called for use of "thermoset" or "thermosettable" tubing.[1] Multi–Tech argued that because its invention addressed a different subject matter than the prior art, its claims should be allowed and a patent should issue.

As stated above, the patent application had to be modified a third time after the PTO's second rejection of the claims. The changes made in the third submission only emphasized the positions taken by Multi–Tech during its second submission to the PTO regarding the differences between thermoplastic and thermosetting material. Specifically, the PTO rejected the claims the second time because one could not tell what type of plastic, thermosetting or thermoplastic, plaintiff was using in its process:

(1) Claims 1, 3, 5, 7–11 are rejected under 35 USC 112 as vague and indefinite. It appeared from applicants' specification that the material being worked upon (for example, polyethylene terephthalate ["PET"]) is a thermoplastic material which is heat stabilized by the application of heat, or in other words being shrunk or thermoset by the application of heat. However, applicants' amendments and arguments presented in Amendment A received Jan. 23, 1973 appears to state that the plastic material being worked upon is a thermosetting plastic composition and from applicants' remarks, page 4, lines 3–6 the definition of thermoset is what is generally held to be the accepted terms of the industry i.e., "those materials which solidify or set upon heating

---

1. Independent claim 3 is representative of the claims:

A method of fabricating a jacket for a small electrical component from a heat shrinkable tube formed of *thermosetting material* in the form of a wound bonded ribbon, said method comprising the steps of

[i] providing elongated sections of heat-shrinkable *thermosettable* tube of substantial length formed of a wound bonded ribbon wound at an acute angle with respect to the axis of said tube which have an axial length that is of substantially greater length than the length of the jackets to be fabricated,

[ii] placing said *thermosettable* tube members on individual male mould members,

[iii] passing said male mould members with said tube members mounted thereon through a heated area to shrink and dimensionally stabilize said tube members to provide cured tube members conforming to the outer configuration of said male mould members,

[and, iv] removing said cured tube members from said male mould members and cutting said cured tube members into individual jacket members of a desired length.

'527 Patent at Column 4 (emphasis added).

**618**

and cannot be remelted". However, applicants' specification does not support the use of a plastic of thermosetting composition, Note page 4, line 14 and page 6, line 4. Polyethylene terephthalate as presented in claims 9 and 11 [2] is a thermoplastic composition and it is not understood what type of plastic, (thermosetting or thermoplastic), applicants are using in their process.

PTO Communication, Final Rejection, March 19, 1973, Appendix to Defendant's Motion for Summary Judgment at A52 (D.I. 30A).

Recognizing the important difference between thermoplastic and thermosettable materials, in an effort to secure the patent, Multi–Tech in its third submission represented to the PTO that "Mylar is a thermoset material and the reference to it being a 'thermoplastic' on page 4, line 14 of the specification is a typographical error which is corrected by this amendment." June 26, 1973, Response to PTO Action at 3, Appendix to Defendant's Motion for Summary Judgment at A58 (D.I. 30A).[3] After this elimination of all references to PET being a thermoplastic, the PTO accepted Multi–Tech's arguments and granted the patent on November 27, 1973.

Thus, it is clear that Multi–Tech never backed away from its statements to the PTO about the differences between thermoplastic and thermoset materials, even if it did offer a misstatement to the examiner as to the character of PET. Its actions demonstrate that Multi–Tech and its patent attorney understood the important differ-

ence between the adjectives thermoplastic and thermosettable as they applied to the material covered by its invention and as they affected the chances of acquiring a patent for its claims.

Commencing in 1973, the defendant purchased capacitor jackets from the plaintiff. Since February, 1982, however, it has chosen to manufacture its own tubes from MYLAR, a polyethylene terephthalate supplied to it by E.I. du Pont de Nemours and Company. The tubes manufactured from MYLAR were the basis of the plaintiff's instituting suit against the defendant.

Since the initiation of this lawsuit, the defendant has maintained on repeated occasions that it was not infringing the '527 patent because it used MYLAR which is a thermoplastic, not a thermosettable, material and the '527 patent applies only to plastic tubes or jackets made from thermosettable materials.[4] In fact, it appears that counsel for the parties orally agreed on November 30, 1987, that manufacture of a tube that uses a thermoplastic material does not infringe the '527 patent. Appendix to Defendant's Motion for Attorneys' Fees at A7 (D.I. 54A). Yet in response to the Defendant's First Set of Requests for Admission, Multi–Tech took the position that "[t]he claims of the patent in suit may encompass certain resins with thermoplastic properties, but which nevertheless are or become heat shrinkable and thermosettable through application of heat or through the addition of certain adhesives and curing agents during the manufacturing process." Plaintiff's Response to Defendant's Re-

---

**2.** Claims 9 and 11 in Multi–Tech's patent application became claims 5 and 7 in the '527 patent.

**3.** The text relied upon by the plaintiff in making this representation, Simonds and Church, *Concise Guide To Plastics,* 2d Ed.1963, does refer to Mylar as a thermoset material at page 6 but also refers at page 277 to the DuPont Co. as a supplier of a variety of thermoplastic materials and in listing those includes Mylar.

**4.** Indeed, the defendant contacted the plaintiff as early as March 31, 1987, informing Multi–Tech of its position that it was not infringing the '527 patent because Components was not using a thermosetting material in its manufacture of capacitor jackets. After Multi–Tech initiated the suit, Components again wrote to the

plaintiff reasserting its position that its use of MYLAR in its manufacture of the capacitor jackets was not infringing the '527 patent. On December 1, 1987, Components contacted Multi–Tech's counsel and once more argued that the '527 patent was not infringed because Components used a thermoplastic and not thermosettable material in its manufacturing process. Components contacted Multi–Tech on February 29, 1988, asserting its position of noninfringement once again, urging that the suit be dismissed and stating that if Multi–Tech insisted on pursuing the litigation Components would file a motion for recovery of its fees and costs. Appendix to Defendant's Motion for Attorneys' Fees at A1–8, A13–14 (D.I. 54A).

quests for Admission, Appendix to Defendant's Motion for Attorneys' Fees at All (D.I. 54A). Moreover, in response to the Defendant's Second Set of Requests for Admission, the plaintiff refused to admit that MYLAR, the only material at issue in this litigation, is a thermoplastic material. Plaintiff's Response to Defendant's Second Set of Requests for Admission, Appendix to Defendant's Motion for Attorneys' Fees at A19 (D.I. 54A).

In our ruling of August 5, 1988, we found that the defendant had introduced ample proof that MYLAR in general, and as the defendant uses it, is a thermoplastic material. We rejected the plaintiff's argument that the reference in the '527 patent to polyethylene terephthalate ("PET" and the generic word for the trade name MYLAR) as a thermosettable material meant that MYLAR was included in the scope of the patent's coverage, terming that inclusion a misstatement because, contrary to Multi–Tech's representation to the PTO, PET is a thermoplastic. Further, we found that the plaintiff had produced no evidence to contradict the characterization of MYLAR as a thermoplastic and not a thermosettable material. Having so found, we then applied the doctrine of file wrapper estoppel and held that: (1) the plaintiff was bound by the definitions of thermoplastic and thermosettable materials made to the PTO, (2) using these definitions there was no literal infringement, and therefore (3) the defendant was entitled to summary judgment of noninfringement as a matter of law.

## II. ANALYSIS

### A. *The Plaintiff's Motion to Supplement.*

Although filed last, we will address first the plaintiff's motion to file a supplemental memorandum in support of its opposition to the defendant's motion. The basic thrust of the plaintiff's argument is that in the defendant's reply memorandum in support of its motion for attorneys' fees, Components recited a "misleading and self-serving characterization of ... settlement negotiations ... in an attempt to demonstrate that plaintiff's pursuit of this litigation was motivated by bad faith." Plaintiff's Motion to Supplement at 1 (D.I. 60). Of course, this characterization of the argument in its reply memorandum is rejected by Components, and it urges the Court to deny the plaintiff's motion. Defendant's Memorandum Opposing Motion to Supplement (D.I. 61).

▮ The plaintiff's argument that it should be permitted a supplemental brief is based on Local Rule 3.2(D)(2): the plaintiff claims that subject matter not raised in the defendant's opening brief was reserved for its reply brief. However, as the defendant has noted, the issue of the plaintiff's motive in pursuing the litigation was fairly raised by the plaintiff in its answering memorandum. The purpose of Local Rule 3.2(D)(2) is to ensure that the answering party is not unfairly surprised by arguments first advanced in its opponent's reply brief. For this reason, Components is not prevented from discussing the issue of motive in its reply brief in view of the fact that the plaintiff had already raised it. Moreover, even if we were to strike the defendant's footnote 5 in which the disputed reference to the plaintiff's motive is made, we would arrive at the same decision on the defendant's motion for an award of attorney's fees. To reach this decision we have not relied on subjective speculation regarding plaintiff's motives but rather, as we have set out herein, on an objective review of plaintiff's actions in light of the concessions made to the PTO in order to obtain the patent.

### B. *The Defendant's Motion for Attorneys' Fees.*

Turning then to the defendant's motion for fees, section 285 of title 35 of the United States Code provides: "The court in exceptional cases may award reasonable attorney fees to the prevailing party." The Court of Appeals for the Federal Circuit has held that this standard may be broken down into four parts: "(1) the case must be exceptional, (2) the district court may exercise its discretion, (3) the fees must be reasonable, and (4) the fees may be award-

ed only to the prevailing party." *Machinery Corporation of America v. Gullfiber AB,* 774 F.2d 467, 470 (Fed.Cir.1985). The purpose of section 285 is to prevent injustice by compensating the prevailing party for its monetary outlays in prosecution or defense of a suit where the conduct of the losing party is clearly inequitable. *Rohm & Haas Co. v. Crystal Chemical Co.,* 736 F.2d 688, 692 (Fed.Cir.1984); *see also Central Soya Co., Inc. v. Geo. A. Hormel & Co.,* 723 F.2d 1573, 1578 (Fed.Cir.1983); *Nordek Corp. v. Garbe Iron Works, Inc.,* 221 U.S.P.Q. (BNA) 632, 634, 1983 WL 223 (N.D.Ill.1983).

In light of the fact that only the prevailing party in this litigation has asked for attorneys' fees and because additional memoranda will be necessary to determine the reasonableness of any fees if they are awarded, we need at this time consider only two parts of the standard. The initial question we must address is whether the plaintiff's actions make this case an exceptional one. *Afros S.P.A. v. Krauss–Maffei Corp.,* 671 F.Supp. 1402, 1440 (D.Del.1987) (citing *S.C. Johnson & Son, Inc. v. Carter–Wallace, Inc.,* 781 F.2d 198, 201 (Fed.Cir. 1986)). For a case to be termed exceptional, we are required to articulate the facts upon which we base this conclusion. *S.C. Johnson & Son, Inc. v. Carter–Wallace, Inc.,* 781 F.2d 198, 201 (Fed.Cir.1986); *Reactive Metals Alloys Corp. v. ESM, Inc.,* 769 F.2d 1578, 1582 (Fed.Cir.1985).

An exceptional case must be established by clear and convincing evidence. *Advance Transformer Co. v. Levinson,* 837 F.2d 1081, 1085 (Fed.Cir.1988); *Reactive Metals,* 769 F.2d at 1582. In general, "[t]here must be some finding ... of unfairness, bad faith, inequitable conduct, vexatious litigation or some similar exceptional circumstances" before an award of attorneys' fees is appropriate. *Morgan Adhesives Co. v. Chemtrol Adhesives, Inc.,* 574 F.Supp. 832, 836 (N.D.Ohio 1983) (quoting *Stevenson v. Sears, Roebuck & Co.,* 713 F.2d 705, 713 (Fed.Cir.1983)); *Advance Transformer,* 837 F.2d at 1085 (same). Additionally, a court will look to "the closeness of the case ... and the parties' conduct ... including evidence of bad faith" in making a determination regarding whether the case is an exceptional one justifying the award of attorneys' fees. *Afros S.P.A.,* 671 F.Supp. at 1440 (citations omitted).

In *Bayer Aktiengesellschaft v. Duphar International Research,* 738 F.2d 1237 (Fed.Cir.1984), the Federal Circuit specifically addressed the standard for awarding attorneys' fees to a prevailing accused infringer. In *Bayer,* the court stated that "exceptional circumstances include, *inter alia,* inequitable conduct during prosecution of a patent, misconduct during litigation, vexatious or *unjustified litigation, or a frivolous suit." Id.* at 1242 (emphasis added) (footnotes omitted). Stated another way, a successful defendant in a patent infringement suit seeking to recover fees must demonstrate that there is evidence of actual wrongful intent or of gross negligence on the part of the plaintiff in bringing the action. *See Machinery,* 774 F.2d at 473.

■ Following the guidance supplied to us by the Federal Circuit, we hold that this is an exceptional case under 35 U.S.C. section 285 and find that the defendant has demonstrated this by clear and convincing evidence. Pursuant to *Bayer,* we find that this litigation was unjustified and that this was a frivolous lawsuit which intelligent people should have known would have no chance at success. 738 F.2d at 1242; *Afros S.P.A.,* 671 F.Supp. at 1440; *see also Kaehni v. Diffraction Co.,* 342 F.Supp. 523 (D.Md.1972) (infringement question was not close enough so that scientifically-informed reasonable persons might differ), *aff'd mem.* 473 F.2d 908 (4th Cir.), *cert. denied* 414 U.S. 854, 94 S.Ct. 151, 38 L.Ed. 2d 103 (1973).

In so finding we are aware that three affidavits from attorneys were submitted by the plaintiff to defend against the defendants' motion for fees. The first of these affidavits is from the attorney who, as mentioned above, represented the plaintiff in applying for the patent. This attorney states that he was again consulted by the plaintiff in late 1986 or early 1987 "regarding the validity and enforceability of U.S.

Patent 3,775,527." At that time he advised the plaintiff that it had a reasonable basis for commencing this suit for infringement because "the characterization of Mylar as a thermosettable substance was only one of several reasons for distinguishing the [Multi-Tech] process from the prior art, and it reasonably could be argued that the patent would have issued even without this distinction," and because "the patent specifically identified the preferred material (Mylar or PET) to be used in the patented process...." Appendix to Defendant's Brief at A3 (D.I. 58A) We do not agree after our review of the prosecution history of the 527 patent that it "reasonably" could be argued that the patent would have issued either without the limitation of the process to the use of thermosettable materials or without the mischaracterization of MYLAR or PET as such.

In the next affidavit, the second attorney states that his firm was contacted by the plaintiff's trial counsel in early 1987 "to undertake a validity study of United States Patent No. 3,775,527" in connection with the preparation of the present litigation. He goes on to state that he was referred to the defendant's contention that the '527 patent would not have issued if MYLAR had not been mischaracterized as thermosetting. In reply to this, the second attorney opined that "thermoset" as used in the patent "could legitimately describe the function of the material utilized in the method claims, rather than the chemical nature of the polymer itself." He acknowledged that this may not be the "most conventional use of that term" but it was "clearly consistent with the disclosures of the specification which discloses only the use of polyethelene terephthlate [sic] or PET." The second attorney similarly concludes that, since "a claim in dependent form shall be construed to incorporate by reference all of the limitations of the claim to which it refers," the use of PET in claims 5 and 7, dependent on the "thermosettable tube" called for in claims 1 and 3, renders PET "thermosettable" under the definitions of the '527 patent. *Id.* at A7–8.

Again we cannot accept this as reasonable legal argument if account has been taken of the definitions of "thermoset" and "thermoplastic" used by the plaintiff in its revised submission to the PTO. See pp. 616–17 *supra.*

The last affidavit is submitted by the third attorney, who was contacted by the plaintiff's trial counsel in March, 1988. The third attorney advised the plaintiff's trial counsel that there was a reasonable basis to oppose the defendant's contemplated motion for summary judgment. The grounds for this advice included the contentions that it "matters not at all, insofar as the practice of the process is concerned, whether the tube is characterized as thermosetting or thermoplastic," and that "the patentee, as his own lexicographer, could use the words 'thermoset' and 'thermosettable' in a broad sense to mean 'stabilized or set by heat.'" *Id.* at A13–14. Once more, we have to reject this as an acceptable argument in this case in view of the plaintiff's representations to the PTO, including its definition of "thermoset" and "thermosettable."

We conclude by examining the entire history of the patent that the affiants could not have studied the entire prosecution history because a careful examination would not permit the opinion that *as used in the '527 patent* "thermosettable" was merely a descriptive term that could have applied to a thermoplastic material such as MYLAR. Even though there is some overlap between some of the properties of thermoplastic and thermosettable materials, namely that both are "set" by application of heat,[5] we cannot now permit the plaintiff to ignore the fact that it distinguished its invention from the prior art on the basis that the materials used were thermosettable, not thermoplastic. Moreover, just as the "[f]ailure to obtain advice of counsel does not conclusively establish ... a patentee's bad faith or in itself make the case 'exceptional,'" *Machinery,* 774 F.2d at 473, we find that obtaining the advice of counsel does not conclusively establish the patentee's absence of bad faith in bringing an

---

**5.** See definitions as used by the plaintiff in its patent application at pp. 616–17 *supra.*

infringement action or prevent a case from being termed exceptional. We now turn to the issue of whether the plaintiff exhibited bad faith in bringing this action and in continuing to prosecute it.

We find that continuing to advance this case in light of the well-documented prosecution history, which indicates unequivocally that thermoplastic materials were excluded from the scope of the patent, is evidence that the plaintiff's actions were taken at the very least with gross negligence. This factor makes this case exceptional. *Advance Transformer,* 837 F.2d at 1085; *Machinery,* 774 F.2d at 473; *Bayer,* 738 F.2d at 1242; *Stevenson,* 713 F.2d at 713; *Afros S.P.A.,* 671 F.Supp. at 1440.

It is black letter patent law that prosecution history estoppel prevents a patentee from expanding the scope of his claims once certain coverage has been abandoned during the prosecution of the patent in order to convince the PTO to grant the patent. *See, e.g., Builders Concrete, Inc. v. Bremerton Concrete Products Co.,* 757 F.2d 255, 258 (Fed.Cir.1985). Clearly, the prior art included thermoplastic material—material that once set and molded by application of heat can still be remolded. Multi–Tech was granted its patent based on its representations that its invention concerned only thermosettable material—material that once set and molded by application of heat can not be remolded. For Multi–Tech to argue in this litigation that the terms thermosettable and thermoset were merely descriptive terms that could include thermoplastic materials is incongruous. Every representation made to the PTO during the prosecution of the '527 patent indicated that the plaintiff knew the difference, and the importance of the difference, between the two terms and that it molded its arguments specifically to thermosettable materials.

Additionally, although this is a case in which the plaintiff sought the advice of outside counsel, and that advice appears to be supportive of the plaintiff's position, the bottom line is that the plaintiff, a company whose profits derive from the plastics field, knew, as demonstrated in its submissions to the PTO, that its invention did not cover capacitor jackets made from thermoplastic material. Further, Multi–Tech was in the best position to understand that nature of the events surrounding the prosecution of its patent, wherein the claims were modified to highlight the differences between thermosettable and thermoplastic material, so that the invention would be patentable over the prior art. Considered in this light, the plaintiff's claim now that the terms thermoset and thermosettable as used in its patent can also cover thermoplastic material must be viewed as evidence of an unjustifiable prosecution of this patent infringement case.

Finally, we find that the defendant's actions in persisting in its position that the litigation was baseless and its numerous contacts with the plaintiff's counsel asking him to drop the case, explaining the defendant's reasons for considering the case to be baseless, and informing him that Components would seek recovery of attorneys' fees, costs, and expenses, sufficiently alerted Multi–Tech that such a request was going to be made and gave notice that Multi–Tech should have carefully evaluated the propriety of proceeding with this litigation.[6] All of these factors considered together, though perhaps none by itself is sufficient, demonstrate by clear and convincing evidence that this is an exceptional

---

**6.** We do not hold that continuation of a suit after a party has been informed that its opponent will seek attorneys fees is sufficient to indicate bad faith on the part of that party if it is ultimately unsuccessful at the conclusion of the litigation. However, pursuing litigation in the face of such notice will negate claims by that party that an award of attorneys' fees is inappropriate because the litigation proceeded smoothly and without delay. Thus, although both parties represented to the Court on April 20, 1987, that neither party had "engaged in any delay of the discovery process, and that discovery has been conducted in a timely and orderly fashion," Joint Motion to Amend Case Management Order at 2 (D.I. 25), we do not find that this is enough to overcome the willful disregard exhibited by the plaintiff in bringing this suit. Simply being cooperative in discovery does not eradicate other evidence of bad faith exhibited by a party.

case within the meaning of the statute; attorneys' fees may therefore be awarded.

Having found that this is an exceptional case pursuant to 35 U.S.C. section 285, we must now determine whether attorneys' fees should be awarded. *Rohm & Haas,* 736 F.2d at 691 (even if sufficient evidence exists to award attorneys' fees, the court still has discretion as to whether or not they should be awarded). The fact that the plaintiff represents to the Court that it would not have brought this action unless it actually thought it could have won because, as a small company, it could not afford to pay the defendant's attorneys' fees, *see* Plaintiff's Answering Brief at 23–24 (D.I. 58), does not sway us that such an award is inappropriate. Wishful thinking should not be permitted to blot out the considerations of relevant facts that demonstrate the invalidity of a claim.

In view of the familiarity which the plaintiff's patent attorney should have had with the prosecution history of the '527 patent, we find that the plaintiff's persistence in pursuing this action and in refusing to admit what it had clearly conceded in its submissions to the PTO has caused defendant to bear a "grossly unjust" burden. *See Machinery,* 774 F.2d at 471. We find that the defendant has provided ample proof that such an award is appropriate and for this reason we will exercise our discretion and grant the Motion for Attorneys' Fees.

The Court will order the plaintiff to pay the defendant's reasonable attorneys' fees. Within twenty days the parties shall confer and arrange an appropriate schedule for submissions to the Court regarding the amount of attorneys' fees to be awarded.

An appropriate order will follow.