**RAMBUS, INC., Plaintiff,**

v.

**INFINEON TECHNOLOGIES AG, Infineon Technologies North America Corp., and Infineon Technologies Holding North America, Inc., Defendants.**

**No. CIV.A.3:00CV524.**

United States District Court,
E.D. Virginia.
Richmond Division.

Aug. 9, 2001.

Michael W. Smith, Craig T. Merritt, Christian & Barton, L.L.P., Richmond, VA, David E. Monahan, John Allcock, Gray Cary Ware & Freidenrich LLP, San Diego, CA, for Plaintiff.

Brian C. Riopelle, Robert M. Tyler, McGuire Woods, LLP, Richmond, VA, John M. Desmarais, Kirkland & Ellis, New York, NY, for Defendants.

## MEMORANDUM OPINION

PAYNE, District Judge.

The Defendants and Counterclaim Plaintiffs, Infineon Technologies AG, Infineon Technologies North America Corp. and Infineon Technologies Holding North America, Inc., (collectively "Infineon") prevailed on the claims of patent infringement asserted by the Plaintiff and Counterclaim Defendant, Rambus, Inc. ("Rambus"). At the conclusion of a two and one-half week trial, the jury found in favor of Infineon on its constructive fraud and actual fraud counterclaims. By separate opinion and order, the verdict on the constructive fraud count is to be set aside, the Court having granted Rambus' motion for judgment as a matter of law on that count; and the verdict on the actual fraud claim is to be set aside in part.

Infineon now petitions the Court for an award of attorneys' fees and costs under: (1) 35 U.S.C. § 285, which allows the prevailing party in a patent case to recover its attorneys' fees in "exceptional" circumstances; (2) Virginia law for its attorneys' fees incurred in pursuit of the fraud claim; and (3) the inherent equitable power of the court to sanction those parties that litigate in bad faith. For the reasons set forth below, the request for attorneys' fees and costs pursuant to § 285 and under Virginia law (as a prevailing party of a claim of

fraud) is granted; and the request for fees and costs under the inherent equitable power of the court is denied.[1]

## STATEMENT OF PROCEDURAL AND FACTUAL BACKGROUND

### I. Procedural Background

Rambus filed a complaint on August 8, 2000, alleging that Infineon had infringed two of its patents. On October 20, 2000, Rambus filed a First Amended Complaint which added charges of infringement of two additional patents. In March 2001, the Court issued an opinion pursuant to *Markman v. Westview Instrs. Inc.*, 52 F.3d 967 (Fed.Cir.1995), *aff'd* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996) to construe the disputed claim terms of the patent. Thereafter, Rambus abandoned, before trial, the charge of infringement as to one of the patents-in-suit, U.S. Patent No. 5,954,804. After the presentation of Rambus' infringement case, the Court granted JMOL in Infineon's favor on the remaining three patents-in-suit, U.S. Patent Nos. 5,953,263; 6,032,214; and 6,034,918.

The trial proceeded, however, on the counterclaims filed by Infineon. After prevailing on the infringement suit, Infineon agreed that its claims of invalidity, non-infringement and unenforceability of the four patents-in-suit (Counts 1–4) were moot, as was its claim for monopolization of the relevant technology market in violation of the Sherman Act, 15 U.S.C. § 2 (Count 12). The Court granted JMOL in favor of Rambus on Counts 8 and 9, which alleged that Rambus breached its contract with JEDEC,[2] a technology standards-setting body (Count 8) and that Infineon was a third-party beneficiary of that breached contract (Count 9). The Court also granted JMOL in favor of Rambus on Infineon's attempted monopolization claim (Count 13). *See* 15 U.S.C. § 2.

At the conclusion of the two and one-half week trial, the jury, in a special verdict form, found Rambus liable for committing actual and constructive fraud in its conduct at JEDEC respecting both the Synchronous Dynamic Random Access Memory ("SDRAM") and the Double Data Rate SDRAM ("DDR SDRAM") standards adopted by JEDEC. The jury awarded nominal damages in the amount of $1.00 on each of the fraud claims (Count 10—actual fraud; Count 11—constructive fraud) and punitive damages in the amount of $3,500,000.00 on the actual fraud claim. Pursuant to Va.Code § 8.01–38.1, the Court reduced the amount of punitive damages to $350,000.00. The jury found in favor of Rambus on Infineon's claim of a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* (Count 14).

By separate opinion and order entered this day, the finding of liability on the constructive fraud claim (Count 11) is set aside, and that part of the verdict finding Rambus liable for actual fraud (Count 10) respecting its conduct in connection with the DDR SDRAM standard is also set aside.

### A. Factual Background

Rambus is a technology company that designs and licenses computer memory

---

1. Infineon asserted, in its Counterclaim, claims for antitrust law violations and breaches of contract, which were dismissed under Fed.R.Civ.P. 50 and a claim for civil RICO which was rejected by the jury. Infineon makes no claim for fees incurred in pursuing those unsuccessful claims.

2. "JEDEC" is the acronym for the Joint Electronics Devices Engineering Counsel. Its parent organization is the Electronic Industry Association.

systems. Rambus does not manufacture memory devices, but instead licenses its technologies to semiconductor manufacturers. The existence and the profitability of Rambus depends entirely on securing patents and licensing them to manufacturers.

In April 1990, Rambus filed a patent application covering a new design for computer memory systems. The United States Patent and Trademark Office ("PTO") determined that this application, U.S. Patent App. No. 07/510,898 ("the '898 application"), contained 11 independent and distinct inventions. The PTO, therefore, required Rambus to select only one of those inventions to pursue in the '898 application and allowed it to file divisional applications on the remaining inventions. Rambus did precisely that.

As of the date of trial, Rambus had been granted 31 patents based on the 1990 '898 application and numerous applications are currently pending. Many of these early patents are directed to "Rambus DRAMs" or "RDRAMs," which is a predecessor to the SDRAM technology. Rambus licensed several semiconductor manufacturers, including Infineon, for the RDRAM technology.

The four patents-in-suit, however, are addressed to SDRAMs and DDR SDRAMs. In a SDRAM, the central processing unit, or CPU, sends and receives information from the memory device according to the "tick" of a "clock" contained within the memory system. In DDR SDRAMs, the rate of the transfer of information is doubled because information is sent on both the "tick" and the "tock" of the clock.

Infineon makes and sells a variety of semiconductor devices to be used in computers, including SDRAMs and DDR SDRAMs. Infineon's fraud claim focused on Rambus' conduct while Rambus and Infineon were members of JEDEC, an association of semiconductor manufacturers and designers who collaborate to develop industry-wide technical standards for semiconductor products in order to ensure that Dynamic Random Access Memory ("DRAM") products, made by different manufacturers, are compatible with one another. As part of its standard-setting process, JEDEC sought to avoid incorporating patented technology into its standards. To that end, JEDEC policy required members to disclose patents and patent applications that related to JEDEC's standard-setting work. If JEDEC decided to include a patented technology in a standard, its members who held patents on that technology were required (by agreement) to license that technology "under reasonable terms and conditions that are demonstrably free of any unfair discrimination."

Although a central issue in dispute at trial was whether, before 1993, JEDEC members had a duty to disclose *pending* patent applications (and not just patents that had been issued), the jury concluded that Rambus' disclosure duty extended to both issued patents and pending patent applications. The jury found that Rambus had committed actual fraud by failing disclose its patents or pending patent applications to JEDEC while it was a member of that organization.

The applications for the four patents-in-suit were filed after Rambus had withdrawn its membership from JEDEC. Specifically, the four applications were submitted between 1997 and 1999 and issued in 1999 and 2000. However, the evidence showed that the four patents-in-suit are divisional or continuation applications of other Rambus patents which were pending during the time that Rambus was a member of JEDEC, and at a time when Rambus had a duty to disclose its pending patents. Infineon offered extensive evi-

dence which convinced the jury that Rambus committed actual fraud by: attending JEDEC meetings, listening to the proposed technology to be included in the JEDEC SDRAM standard, remaining silent (in the face of a duty to disclose) about its pending patent applications during those meetings, and, with the assistance of its patent lawyers, obtaining additional patents to cover the features of the JEDEC SDRAM standard, even as those features were being discussed at Committee JC–42.3 meetings.

## DISCUSSION

### I. An Award of Attorneys' Fees Under 35 U.S.C. § 285

Section 285 provides, quite simply, that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." The purpose of § 285 is two-fold.[3] First, it permits an award of fees "where it would be *grossly unjust* that the winner be left to bear the burden of his own counsel which prevailing litigants normally bear." *Badalamenti v. Dunham's Inc.*, 896 F.2d 1359, 1364 (Fed.Cir. 1990), *cert. denied* 498 U.S. 851, 111 S.Ct. 142, 112 L.Ed.2d 109 (1990) (quoting *J.P. Stevens Co. v. Lex Tex Ltd.*, 822 F.2d 1047, 1052 (Fed.Cir.1987)) (emphasis in original). Thus, under § 285, an award of attorneys' fees compensates the prevailing party for losses incurred as the consequence of the conduct of the losing party. *See Central Soya Co. v. Geo. A. Hormel & Co.*, 723

F.2d 1573, 1578 (Fed.Cir.1983). Additionally, § 285 deters parties from bringing bad faith litigation, *see Mathis v. Spears*, 857 F.2d 749, 753–54 (Fed.Cir.1988), which protects litigants, the courts and the judicial process from abuse. Attorneys' fees are available to the prevailing party under § 285, whether that party is the patentee or the accused infringer. *Eltech Sys. Corp. v. PPG Indus., Inc.*, 903 F.2d 805, 811 (Fed.Cir.1990).[4]

Deciding whether to award attorneys' fees under § 285 necessitates a two-step inquiry. *Interspiro USA, Inc. v. Figgie Int'l Inc.*, 18 F.3d 927, 933 (Fed.Cir. 1994). First, the party requesting the award of fees must prove by *clear and convincing evidence* that, as a matter of fact, the case is exceptional within the meaning of § 285. *Badalamenti*, 896 F.2d at 1364. This means that "there must be some finding of unfairness, bad faith, or inequitable conduct on the part of the unsuccessful patentee." *Id.* (quoting *Stevenson v. Sears, Roebuck & Co.*, 713 F.2d 705, 713, (Fed.Cir.1983); *Advance Transformer Co. v. Levinson*, 837 F.2d 1081, 1085 (Fed. Cir.1988)). "[E]xceptional circumstances include, *inter alia*, inequitable conduct during prosecution of a patent, misconduct during litigation, vexatiousness or unjustified litigation, or a frivolous suit." *Bayer Aktiengesellschaft v. Duphar Intn'l Research*, 738 F.2d 1237, 1242 (Fed.Cir.1984). *See Beckman Instr., Inc. v. LKB Produk-*

---

**3.** Federal Circuit case law "governs the substantive interpretation of 35 U.S.C. § 285, which is unique to patent law." *Pharmacia & Upjohn Co. v. Mylan Pharm., Inc.*, 182 F.3d 1356, 1359 (Fed.Cir.1999).

**4.** Arguably, there could be a third step to the inquiry—determining first whether the party is a prevailing party. "There is little guidance on establishing oneself as a 'prevailing party' for purposes of recovering fees. It is clear that the 'prevailing party' need not have

won on every claim or defense. Generally, whether a party is a 'prevailing' party depending on the circumstances of the case as a whole." William Pelton and Keum Park, *Damages and Attorneys Fees*, 424 PLI/Pat 555, 633 (1995) (citing *Mathis*, 857 F.2d at 756 and *Warner Bros., Inc. v. Dae Rim Trading, Inc.*, 877 F.2d 1120, 1126–27 (2d Cir.1989)).

Rambus does not dispute that Infineon is a prevailing party in this instance.

*ter AB,* 892 F.2d 1547, 1551 (Fed.Cir.1989) ("Among the types of conduct which can form a basis for finding a case exceptional are willful infringement, inequitable conduct before the P.T.O., misconduct during litigation, vexatious or unjustified litigation, and frivolous suit"). *See also Multi–Tech, Inc. v. Components, Inc.,* 708 F.Supp. 615, 620 (D.Del.1989) ("there must be some finding of unfairness, bad faith, inequitable conduct, vexatious litigation or some similar exceptional circumstances.").

Second, if a case is found to be exceptional within the parameters of § 285, it is necessary then to determine whether an award of attorneys' fees to the prevailing party is warranted. *Interspiro,* 18 F.3d at 933. Thus, the district court must decide "whether the award of attorney fees [is] appropriate and whether the amount of the award [is] reasonable." *Reactive Metals and Alloys Corp. v. ESM, Inc.,* 769 F.2d 1578, 1583 (Fed.Cir.1985). This inquiry is entrusted to the discretion of the trial court, *id.,* and the exercise of that discretion is informed by the decisional law interpreting § 285 and the precepts generally accepted for assessing the reasonableness of attorneys' fee awards as applied by the Federal Circuit.

### A. Is this Case Exceptional Under § 285?

■ Infineon asserts that this is an exceptional case because, Rambus (1) acted in bad faith in bringing the patent infringement suit and in continuing to prosecute it after the *Markman* decision; and (2) engaged in misconduct during the prosecution of that suit and during the defense of Infineon's counterclaims. While bad faith and litigation misconduct certainly can supply the basis for an award, that is not to say that "all successful defendants are entitled to attorney fees or to attorney fees and expenses. The requirement in

Section 285 of establishing an 'exceptional case' remains a formidable and adequate barrier to unwarranted awards." *Mathis,* 857 F.2d at 754. Accordingly, "a successful defendant in a patent infringement suit seeking to recover fees must demonstrate that there is evidence of actual wrongful intent or of gross negligence on the part of the plaintiff in bringing the action." *Multi–Tech,* 708 F.Supp. at 620.

### 1. The Basis for Bringing the Suit and the Continued Prosecution of it After the *Markman* Opinion

Attorneys' fees under § 285 may be awarded if the patent infringement suit is baseless or frivolous because "[t]he only deterrent to the ... improper bringing of clearly unwarranted suits on obviously invalid or unenforceable patents is Section 285." *Mathis,* 857 F.2d at 754. "A frivolous lawsuit is one which the patentee knew or, on reasonable investigation, should have known, was baseless." *Haynes Intn'l, Inc. v. Jessop Steel Co.,* 8 F.3d 1573, 1579 (Fed.Cir.1993), *reh'g* 15 F.3d 1076 (Fed.Cir.1994). "Frivolousness must be measured against objective facts." *Refac Intn'l, Inc. v. IBM Corp.,* 710 F.Supp. 569, 570 (D.N.J.1989). "[T]he issue of frivolousness ...is determined at the time suit was filed *and* throughout the time it was maintained." *Haynes,* 8 F.3d at 1580 (emphasis added).

■ Infineon argues that Rambus' patent infringement suit, from the very beginning, lacked merit and, therefore, was frivolous litigation. Under Infineon's argument, Rambus knew, or should have known, that the suit was baseless because: (1) the claim constructions asserted by Rambus were refuted by the intrinsic evidence respecting the patents; and (2) Rambus' fraudulent behavior at JEDEC would have prevented the enforcement of

the patents-in-suit under the theory of equitable estoppel.[5]

### a. The Merit of Rambus' Claim Construction

 It is well-established that the institution of an infringement suit by a patent holder who knew, or should have known, that the patent claims, when properly construed, could not be infringed by the accused products, can support a finding of "exceptional circumstances" under § 285. For example, in *Multi–Tech, Inc. v. Components, Inc.*, 708 F.Supp. 615 (D.Del.1989), the district court found that the case was "exceptional" because the patent holder's decision to prosecute the case, "in light of the well-documented prosecution history" refuting the patent holder's claim construction, constituted at least "gross negligence." *Id.* at 622. A review of the prosecution history of the patent proved that the patentee "distinguished its invention from the prior art"—the same prior art that the patentee, during the litigation, argued was covered by the patent. *Id.* at 621. The court thus found that, given the disclaimers in the patent history, the decision to prosecute, and to continue the prosecution of, the case qualified the case as exceptional. *Id.* at 622.

The finding of exceptionality was further supported by the fact that: (1) as a company whose profits derived from plastics, the patentee knew that its inventions did not cover thermoplastics and its submissions to the PTO proved as much; and (2) the patentee should have carefully evaluated the merits of its suit after repeated statements from the defendant indicating that the suit was baseless and that it would seek recovery of attorneys' fees. *Id.* The *Multi–Tech* court, therefore, concluded that "[a]ll these factors considered together, though perhaps none by itself is sufficient, demonstrate by clear and convincing evidence that this is an exceptional case within the meaning of the statute." *Id.* at 622–23.

Similarly, in *Refac Intn'l Inc. v. IBM Corp.*, 710 F.Supp. 569, 572 (D.N.J.1989), the district court awarded attorneys' fees based on the fact that the plaintiff "knew, or should have known, that the case was frivolous." The district court granted summary judgment in favor of the accused infringers, holding that the patent was invalid under 35 U.S.C. § 112 because it "did not disclose with particularity the invention and did not set forth the 'best mode'". *Id.* at 570. The award of attorneys' fees under § 285 was influenced, in significant part, by the fact that the plaintiff had insisted that a term in the patent had a certain meaning, when the language and drawings of the patent rather clearly dictated otherwise. *Id.* at 571. Furthermore, business records revealed that the plaintiff understood the weakness of its suit, but persisted in prosecuting smaller companies so that they would settle quickly, "which could then be used as a war chest to prosecute others." *Id.* The court concluded that the plaintiff knew, or should have known, that the action was frivolous and that it did not act in good faith in bringing or pressing the action,

---

**5.** To prevail on the defense of equitable estoppel in a patent case, the defendant must prove: (a) misconduct by the patent holder, including statements, action, inaction or silence in the face of an obligation to speak, leading the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer; (b) the alleged infringer relies on that conduct; and (c) due to its reliance, the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim. *Calmac Mfg. Corp. v. Dunham–Bush, Inc.*, 929 F.Supp. 951, 957 (E.D.Va.1996) (citing *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed.Cir.1992)).

and, thereupon assessed attorneys' fees against the plaintiff. *Id.* at 571–72.

Lastly, in *Mathis v. Spears,* 857 F.2d 749 (Fed.Cir.1988), the Federal Circuit upheld the award of attorneys' fees which was predicated on several acts of misconduct, including the institution of a frivolous action. The district court found the patents invalid and unenforceable because of inequitable conduct. *Id.* at 751. The plaintiff had misleadingly told the PTO that the invention was nowhere in prior art; concealed some 295 invoices during discovery which demonstrated invalidity; "disingenuously" explained this discovery noncompliance; submitted misleading evidence of tests; engaged in misconduct upon appeal (such as questioning the court's impartiality); and accused the defendant of "inequitable conduct" solely because it thoroughly researched "every conceivable issue," thus its increasing attorneys' fees. *Id.* at 752–53. The Federal Circuit concluded that "a wrong has been done. Mathis has severely injured [the defendant], having forced it to defend, at monstrous expense, its right to freely compete, subjecting [the defendant] to a totally unwarranted suit and two unwarranted appeals." *Id.* at 753–54.

Applying those basic legal principles to the facts of this case, the clear and convincing evidence shows that Rambus knew, or should have known, that its patent infringement suit was baseless, unjustified, and frivolous—one in which reasonably "intelligent people should have known would have no chance of success." *Multi–Tech,* 708 F.Supp. at 620. As was the case in *Multi–Tech,* Rambus' construction of the disputed claim terms and its theory of infringement were directly at odds with the intrinsic evidence contained in specifications and prosecution histories of the patents-in-suit. As explained more fully in the claim construction opinion issued in

this action, *see Rambus, Inc. v. Infineon AG,* Civil Action No. 3:00cv524 (E.D.Va. March 15, 2001), Rambus' view of the patents was completely untethered to the language of the patent claims or the written description, and, in many cases, flatly contradicted the written description.

One such example of Rambus' repeated disregard of the limitations contained in the patent prosecution history was its construction of the term "bus," which, as shown by the intrinsic evidence, clearly meant "a multiplexed set of signal lines used to transmit address data and control information" in DRAMs. Rambus insisted that the term bus, as used in the patents, did not require the bus lines to be multiplexed. However, the patent specification repeatedly stated that Rambus' inventions were meant to work in conjunction with a multiplexed bus and it even distinguished prior art on the basis that it did not use a multiplexed bus. Significantly, Infineon's products do not use a multiplexed bus. Rambus' construction of the other disputed claim terms was equally untenable because they, too, were fundamentally inconsistent with the specifications and the prosecution histories of the patents-in-suit.

Rambus contends that, because it had expert testimony to support its interpretation of the claim terms, it cannot be said to have lacked a good faith belief in its construction of the claims. That contention fails because the opinions of the expert (Dr. William Huber) were wholly unacceptable for the reasons that: (1) his opinions were not grounded in, or were inconsistent with, the intrinsic evidence; and (2) on cross-examination at the *Markman* hearing, his explanations of the obvious conflicts were inherently incredible. A litigant cannot be allowed to prosecute, under the guise of good faith, a facially erroneous claim construction predicated on the basis of opinions of the sort on which Rambus

relied. If it were otherwise, litigants could avoid an exceptional case determination (and its consequences) simply by proffering meritless expert opinions. To the contrary, the prophylactic purposes of § 285 are best served by requiring litigants to sponsor, and rely on, expert witnesses who tether their opinions to the intrinsic evidence.

Rambus' bad faith is further underscored by its refusal to abandon its infringement case after its claim constructions were altogether rejected in the *Markman* opinion. In fact, the Court asked Rambus whether it could proceed further with its infringement case in the face of the *Markman* opinion. Additionally, counsel for Infineon suggested on three different occasions that Rambus could not pursue its infringement case in light of the *Markman* ruling. In response to the Court and to the assertions of Infineon, Rambus insisted that it could salvage its case. Although Rambus thereafter wisely dropped its assertion of infringement of the single asserted claim of the '804 patent, it pressed ahead with the remaining three patents by formulating an untimely expert report which modified its literal infringement analysis and which added, for the first time, a doctrine of equivalents infringement analysis. Even after the Court rejected these tactics as violative of numerous scheduling orders and inconsistent with the *Markman* ruling, Rambus remained resolute in asserting that it could prove infringement on all 56 claims of the three remaining patents in suit.[6] *See El-tech Sys. Corp. v. PPG Indus., Inc.*, 903

F.2d 805, 811 (Fed.Cir.1990) ("Where ... the patentee is manifestly unreasonable in assessing infringement, while continuing to assert infringement in court, an inference is proper of bad faith, whether grounded in or denominated wrongful intent, recklessness or gross negligence.").

At trial, Rambus again tried to skirt the consequences of the claim interpretation opinion by creating more dispute over the precise scope of the *Markman* ruling, a dispute that had not been raised at the *Markman* hearing or prior to trial. Because the proffered revised testimony of Rambus' expert Dr. Huber appeared to be in conflict with the claim construction opinion, the Court agreed to hear the testimony out of the presence of the jury. The Court excluded most of the testimony, and it appeared that Rambus was about to concede—what had been obvious from the beginning-that it could not present a plausible infringement case under the Court's claim construction. Rambus, however, considered the matter over the weekend and again decided to proceed with its infringement case. After hearing Dr. Huber's testimony and receiving briefing from the parties, the Court granted Infineon's motion for JMOL on the issue of infringement.

The patent prosecution history and the Court's claim interpretation made it quite clear that Infineon's products did not infringe the patents primarily because they did not employ a multiplexed bus. Rambus' decision to proceed in the face of this overwhelming barrier cannot possibly be said to have been made in good faith.

---

**6.** It is noteworthy that Rambus even sought to continue to press patent claims which contained typographical or clerical errors, even though Federal Circuit law clearly holds that a patent holder cannot rely on a certificate of correction in a patent infringement suit filed *before* the certificate issues. *See Southwest Software, Inc. v. Harlequin Inc.*, 226 F.3d

1280 (Fed.Cir.2000). Again, rather than concede the obvious, Rambus marched ahead with these claims until the Court ruled that it could not properly assert those claims. That meant, of course, that Infineon had to incur additional attorneys' fees to prove the utter lack of merit in Rambus' position.

Because the court must judge the frivolousness of the suit both at the commencement of the suit and as it continues, *Haynes*, 8 F.3d at 1580, both the institution of this case and its prosecution after the *Markman* ruling makes it exceptional because Rambus should have known, upon careful consideration, that it could not plausibly present an infringement analysis.

Additionally, even if Rambus believed that it could escape the limitations of the claim construction ruling by relying on a new literal infringement analysis or doctrine of equivalents analysis, that belief was debunked as of the Court's April 19, 2001 ruling which excluded a majority of Dr. Huber's testimony as reflected in his Second Supplemental Report. Therefore, at a minimum, Rambus should have known by the Thursday before jury selection began on Friday, that Infineon's products could not be shown to infringe the remaining patents in suit and therefore, the suit was baseless. Rather than acknowledge the futility of its position, preserve its rights to appeal and proceed to defend the counterclaims, Rambus obdurately pressed claims it knew it could not win. That, and the fact that its claim construction from the outset was based on extrinsic evidence so basically at odds with the intrinsic evidence, makes this an exceptional case.

### b. Rambus' Inequitable Conduct

■ Another purpose of allowing attorneys' fees under § 285 is "to compensate the prevailing party because the losing party's misconduct was so unfair and reckless as to make it unconscionable for the prevailing party to sustain the expense of counsel." *T.A. Pelsue Co. v. Grand Enter., Inc.*, 782 F.Supp. 1476, 1500 (D.Colo. 1991). "In the case of awards to prevailing accused infringers ..., 'exceptional cases' are normally those of bad faith litigation or those involving *fraud or inequitable conduct by the patentee in procuring the patent*." *Cambridge Prods., Ltd. v. Penn Nutrients, Inc.*, 962 F.2d 1048, 1050–51 (Fed.Cir.1992) (emphasis added).

■ The fraud proved at trial is not the genre of inequitable conduct that usually is presented in those decisions holding that inequitable conduct warrants imposition of attorneys' fees under § 285. In most cases, the fraud relates to a patentee's conduct before the PTO. Here, the fraud was directed toward the alleged infringer. The fraudulent scheme proved by Infineon at trial demonstrates that one of Rambus' goals was to procure patent rights on the technology to be included in the JEDEC SDRAM standard. The achievement of this goal, however, necessarily involved a breach of Rambus' duty of disclosure imposed by virtue of its membership in JEDEC. Hence, in a very real way, the fraud committed by Rambus was integral to procuring the patents-in-suit.[7]

---

7. It is important to note that the mere act of amending a patent application in an attempt to cover a competitor's product is not itself improper. *See Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 867, 874 (Fed.Cir.1988) ("there is nothing improper, illegal or inequitable in filing a patent application for the purpose of obtaining a right to exclude a known competitor's product from the market; nor is it in any manner improper to amend or insert claims intended to cover a competitors product the applicant's attorney has learned about during the prosecution of a patent application."). *See also Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1482 (Fed.Cir.1998)

The finding of bad faith here, however, is not premised upon Rambus' choice to file additional claims to cover a competitor's product. Instead, it is the manner in which Rambus accomplished its goal—namely the infiltration of JEDEC and the violation of disclosure duties it accepted by virtue of its membership in JEDEC and by participating in that organization's standard-setting process.

The other purpose of the fraud was to ensure a means of enforcing the patent rights through litigation. The parties have not cited, nor has the Court located, decisions permitting an exceptional case finding where a significant component of the inequitable conduct of the patentee is a scheme to insure the enforceability of a patent (here, by remaining silent in the face of a duty disclose and then using the information obtained about the forthcoming JEDEC SDRAM standard to modify patent applications or file new claims so that Rambus' patents would cover any product that was compliant with the JEDEC standard).

However, that conduct was part of the fraud proved at trial and conduct of that sort has been found to be inequitable. *See Wang Lab., Inc. v. Mitsubishi Elec.*, 103 F.3d 1571, 1582 (Fed.Cir.1997); *Stambler v. Diebold, Inc.*, 11 U.S.P.Q.2d, 1709, 1714–15 (E.D.N.Y.1988), *aff'd* 878 F.2d 1445, 1989 WL 50518 (Fed.Cir.1989); *Potter Instr. Co. v. Storage Tech. Corp.*, 207 U.S.P.Q. 763, 769 (E.D.Va.1980), *aff'd on laches ground*, 641 F.2d 190 (4th Cir.1981). Hence, on this record it seems logical and consistent with precedent to conclude that the fraud found in the breach of the disclosure duty and the manipulation of Rambus' position as a JEDEC member in order to ensure that its patent rights covered the JEDEC standard qualifies as inequitable conduct for the purpose of ascertaining whether this is an exceptional case under § 285. That conduct is not different in any material respect from that on which exceptional case findings have been made on other fact patterns.

Rambus knew that its patents were inextricably tied to its fraudulent conduct at JEDEC; and Rambus knew, or should have known that, if its conduct were discovered, it could very well be estopped or enjoined from asserting those patents.[8] *See Potter Instr. Co., Inc. v. Storage Tech. Corp,* 641 F.2d 190, 192 (4th Cir.1981) ("[equitable] estoppel forecloses ... prospective patent enforcement through an injunction or through damages for continuing infringement") (citing *Studiengesellschaft Kohle v. Eastman Kodak Co.*, 616 F.2d 1315, 1325 (5th Cir.1980)). Indeed, Rambus' patent counsel told its executives as much. This, of course, supplies yet another reason why institution of the patent infringement action here was in bad faith in the first instance. It is also an independent reason for finding this to be an exceptional case.

As explained fully in the opinion addressing Rambus' motion for judgment as a matter of law, the record is replete with evidence of Rambus' fraud during its tenure with JEDEC. From the beginning of its membership in JEDEC, Rambus consciously and deliberately violated the dis-

---

**8.** Infineon's affirmative defense of equitable estoppel was not decided in this case because its success on the infringement claims mooted the defense. The elements for equitable estoppel, however, are analogous in many ways to Infineon's fraud counterclaim, upon which it prevailed. *Compare Calmac Mfg. Corp. v. Dunham–Bush, Inc.*, 929 F.Supp. 951, 957 (E.D.Va.1996) (elements which must be proven for equitable estoppel defense are: (a) misconduct by the patent holder, including statements, action, inaction or silence in the face of an obligation to speak, leading the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer; (b) the alleged infringer relies on that conduct; (c) due to its reliance, the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim) *with ITT Hartford Group, Inc. v. Virginia Finan. Assoc., Inc.*, 258 Va. 193, 520 S.E.2d 355, 361 (1999) (elements of actual fraud under Virginia law are: (1) a false representation; (2) of a material fact; (3) made intentionally and knowingly; (4) with the intent to mislead; (5) reliance by the party mislead; and (6) resulting damage to the party misled).

closure policy of JEDEC by concealing its patents and patent applications which related to JEDEC's SDRAM standards-setting work. Furthermore, Rambus storehoused information on the progress of JEDEC's SDRAM work and used that knowledge to apply for and obtain additional patents that would cover products made in compliance with the JEDEC standard.

The evidence at trial also showed that Rambus knew that JEDEC members would rely on its silence at meetings when drafting and adopting the new SDRAM standard. For example, Rambus' Business Plan reflects its intent to demand royalties from SDRAM manufacturers once Rambus obtained its patents covering the SDRAM standard. Thus, after explaining that the JEDEC SDRAM standard had been in process for over two years and that standard-setting was still underway, the Rambus 1992 Business Plan explained:

> Finally, we believe that Sync DRAMs infringe on some claims in our filed patents; and that there are additional claims we can file for our patents that cover features of Sync DRAMs. Then we will be in position to request patent licensing (fees and royalties) from *any manufacturer of Sync DRAMs* . . . .

Of course, Rambus never told Infineon or JEDEC anything of the sort.

Additionally, the evidence that Infineon discovered after it succeeded on the motion to vitiate the attorney-client privilege under the crime-fraud exception revealed that Rambus' fraudulent behavior was known by and, in some cases perpetrated by, its highest level officials. For example, notes made by Rambus' outside patent counsel during a meeting with Richard Crisp and Allen Roberts (a Rambus executive) on March 27, 1992 show that Rambus knew that a finding of inequitable conduct could be a consequence of non-compliance with the JEDEC disclosure duty:

> — I [Lester Vincent] said there could be equitable estoppel problem if Rambus creates impression in JEDEC that it would not enforce its patent[s] or patent [applications] . . .
>
> — Less clear cut if Rambus is merely silent . . .
>
> — But cannot mislead JEDEC into thinking that Rambus will not enforce its patent[s] . . .
>
> — possibly abstain from voting

Notwithstanding these admonitions about the doubtful nature of its behavior, Rambus remained a member of JEDEC and continued its silence, thus creating the impression that it did not hold patents or have applications relevant to JEDEC's work in the SDRAM standard-setting process. In so doing, Rambus took the calculated risk that its conduct, if discovered during litigation, might lead to a finding that its conduct was inequitable, or worse.

Although the attorney notes and other equally damning documents were only revealed to the Court and to Infineon a month before trial, Rambus had these documents in its possession for many years and knew the risk that the company was taking. Rambus knew, or should have known, that instituting a patent infringement action would not be in good faith and that it could be estopped or enjoined from asserting its fraud-tainted patents. Surely too, as a company whose life's blood is patent rights, Rambus was aware that, if its conduct were found to be inequitable, it faced the prospect of paying attorneys' fees under § 285.

### 2. Litigation Misconduct

■ "Litigation misconduct and unprofessional behavior are relevant to the award of attorney fees, and may suffice to

make a case exceptional under § 285." *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1574 (Fed.Cir.1996). *See also Read Corp. v. Portec, Inc.*, 970 F.2d 816, 831 (Fed.Cir.1992) ("[L]itigation misconduct may in itself make a case 'exceptional.' "). Also, litigation misconduct may be considered along with other factors in making the exceptional case decision. *See Beckman Instr., Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1551 (Fed.Cir.1989) ("Among the types of conduct which can form a basis for finding a case exceptional are willful infringement, inequitable conduct before the P.T.O., misconduct during litigation, vexatious or unjustified litigation, and frivolous suit").

The litigation misconduct asserted by Infineon fits into four general categories: (1) the failure to reveal relevant documents during discovery; (2) inaccurate and, in some instances, outright untruthful testimony from Rambus representatives; (3) inaccurate and improper responses to interrogatories and requests for admissions ("RFAs") during discovery; and (4) the destruction of litigation-related documents.

### a. Failure to Reveal Documents in Discovery

During discovery, Rambus failed to list numerous documents on its privilege log, which (as it was ultimately learned) documented its fraudulent activity at JEDEC. These documents include notes from Rambus' outside patent counsel, Lester Vincent, which memorialize the existence of pending patents and Rambus' efforts to expand its patent coverage. Additionally, those notes establish that Rambus' JEDEC representative Richard Crisp was intimately involved in the patent-drafting efforts—an involvement which Crisp denied under oath in deposition. Rambus addresses the situation by explaining that these documents were inadvertently re-

tained by counsel for Rambus in another infringement case involving the same patents but a different defendant. Even if that is a mistake made without bad faith, Rambus should still be sanctioned for its gross negligence in failing adequately to search all its files and all those in the hands of its counsel in the related case during discovery. Moreover, although former counsel may have retained the document by accident, Lester Vincent possessed copies of the documents and those documents should have been reviewed by Rambus when responding to discovery requests because Vincent was an agent of Rambus and he was responsible for prosecuting many of the applications that Rambus knew were at issue in this action. Therefore, Rambus' explanation does not absolve it of the failure to identify these documents.

### b. False Testimony by Rambus Executives

Rambus representatives also hindered discovery efforts by providing false or misleading testimony. For example, Richard Crisp (a former executive, now a consultant to Rambus) testified in his first deposition that he "never, ever" participated in Rambus' patent drafting efforts. However, when he was confronted with documents obtained after the piercing of the attorney-client privilege, Crisp was forced to admit that he directed which claims should be filed in response to the technology discussions at JEDEC. Similarly, Rambus' Chief Executive Officer, Geoff Tate, at his first deposition, testified that he did not believe that Rambus drafted claims to cover JEDEC's standard-setting work (indeed, he stated that he did not know that it was possible to amend patent claims), but, at trial he admitted, upon being prodded by reference to the belatedly obtained documents, that he knew that Rambus was amending its patent applica-

tions to cover the JEDEC SDRAM standard. Rambus seeks to explain these contradictions by arguing that Crisp and Tate suffered from a memory lapse at their first depositions. That explanation simply strains credulity.

### c. Obfuscatory Discovery Responses

Rambus also obstructed discovery in its written responses to Infineon's interrogatories and RFAs. For instance, Rambus responded to an interrogatory by swearing that it did not review any JEDEC or Synclink standards when drafting its patent claims, even though notes from Lester Vincent (the lawyer who was drafting the Rambus claims) reveal that he specifically requested copies of these standards. Additionally, Rambus refused to admit facts which were not genuinely at issue in trial, thus putting Infineon to the burden of proving facts that were indisputably true, such as: the date of Rambus' membership at JEDEC; the composition of Rambus' patent family tree; Crisp's understanding that JEDEC's patent policy related to both patents and pending patent applications; Rambus' failure to check a box on the JEDEC ballots indicating that it knew of patents relating to the standard at issue; and the accuracy of language which came from Rambus' own documents.

### d. Rambus' Document Destruction

Lastly, the record in this case shows that Rambus implemented a "document retention policy," in part, for the purpose of getting rid of documents that might be harmful in litigation. Rambus instituted its document retention policy in 1998. Clearly, Rambus contemplated that it might be bringing patent infringement suits during this timeframe if its licensing efforts were not successful—its Business Plan unequivocally states that the issuance of its JEDEC-related patents would put it in a position to demand royalties from semi-conductor manufacturers.

Rambus executive Allen Roberts testified that one of the reasons for the document destruction was that the documents might be discoverable in future litigation, although he also stated that the policy was basically just a "house-keeping thing." Additionally, Lester Vincent testified that, although he did not destroy any documents relating to the present litigation after this action was filed, he admitted that he destroyed some documents, pursuant to instructions from Rambus, just before this litigation began but after Rambus sent a letter to Infineon accusing it of infringement. This behavior also qualifies as litigation misconduct. *See Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1575 (Fed. Cir.1996) (remanding case to consider award of fees and noting that "there is an uncompromising duty to preserve relevant records, and particularly after litigation has begun."); *Hoechst Celanese Corp. v. BP Chems. Ltd.*, 65 F.3d 188 (table), 1995 WL 506964, *4 (Fed.Cir.1995) (recognizing that inconsistent statement given in affidavit during discovery constituted litigation misconduct); *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1186–87 (Fed.Cir.1995) (remanding case to determine if plaintiff's intentional destruction of documents after the litigation began, warranted award of fees).

### e. Conclusion: Litigation Misconduct

Although the asserted grounds of litigation misconduct considered in isolation may not warrant a finding that this is an exceptional case, it is clear that, when considered in total, they support a finding of exceptionality under § 285. The tactics Rambus chose to employ made it very expensive for Infineon to uncover and prove the fraud. The denial of RFAs and

the negative answers to interrogatories required Infineon to embark on a protracted search by deposition and documents for proof that Rambus knew about JEDEC's disclosure policy, had pending applications relating to JEDEC's work and was amending those applications based upon discussions underway at JEDEC meetings. In early depositions, Crisp and Tate simply did not admit the truth. Because of the document destruction (made, it should be remembered, in anticipation of litigation) and because Rambus did not search the files of one of the lawyers who applied for patents during the key period, the documents produced omitted the documents that revealed, or pointed the way to, the truth. When the crime-fraud ruling forced disclosure of those documents, they told a story far different than reflected in Rambus' initial discovery responses and depositions; and that, of course, necessitated another round of depositions where, with the aid of the new documents, the truth began to emerge.

It simply is unfair to allow Rambus to escape financial responsibility for its litigation misconduct. In this case, that misconduct, considered as a whole, and in connection with the other factors (*see generally* Section I.A.1, *supra*) warrant a finding that this is an exceptional case.

## B. Do the Facts of this Case Warrant the Award of Attorneys' Fees, And If So, In What Amount?

### 1. Propriety of Awarding Fees

■ Even if sufficient evidence exists to award attorneys' fees, the court nevertheless possesses discretion as to whether or not they should be awarded. *Enzo Biochem, Inc. v. Calgene, Inc.*, 188 F.3d 1362, 1370 (Fed.Cir.1999). "[T]here are a number of factors that courts may consider in determining whether an award of attor-

ney's fees is warranted, such as the 'closeness of the case, tactics of counsel, the conduct of the parties and any other factors that may contribute to a fairer allocation of the burdens of litigation as between winner and loser.'" *Knorr–Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 133 F.Supp.2d 843, 864 (E.D.Va. 2001) (citing *J.P. Stevens Co., Inc. v. Lex Tex Ltd., Inc.*, 822 F.2d 1047, 1051 (Fed. Cir.1987)).

As determined above, this case is exceptional because: (1) Rambus knew, or should have known, that its infringement action was baseless because of the inherently implausible theory of infringement and patent claim construction pressed by Rambus; (2) Rambus knew, or should have known, that its patents were unenforceable due to its fraudulent and inequitable behavior while it was a member of JEDEC; and (3) Rambus engaged in a series of litigation misconducts directed at masking its fraud. Although the *Markman* hearing was protracted and complicated, in the end, the construction of the patent claims was not a "close" decision and the Court rejected every one of Rambus' proposed interpretations. Additionally, in light of the rather clear intrinsic evidence, Rambus' infringement theory could not have been credibly asserted. As outlined above, the conduct of Rambus both during its membership at JEDEC, and its actions once it decided to press its infringements claims, was pervasively inequitable.

In sum, Rambus' baseless patent suit, which was a integral part of its fraudulent scheme, makes it unquestionably fair to assess the burden of Infineon's litigation expenses to Rambus. This case is both exceptional and appropriate for the award of fees.

## 2. The Amount of the Fee

Infineon requests an award of fees and expenses totaling $7,123,989.52.[9] The framework for assessing this request is outlined below.

The award of attorneys' fees under § 285 "include[s] those sums that the prevailing party incurs in the preparation for and performance of legal services related to the suit." *Central Soya Co., Inc. v. Geo. A. Hormel & Co.,* 723 F.2d 1573, 1578 (Fed.Cir.1983). Infineon seeks recovery, under § 285, of the fees expended in defense of the patent infringement case *and* in the prosecution of its fraud counterclaim.[10] It argues that the non-patent claims are inextricably intertwined with the issues in the patent case. *See Stickle v. Heublein, Inc.,* 716 F.2d 1550, 1564 (Fed.Cir.1983) ("Where an action combines both patent and nonpatent claims, the non-patent issues may in some instances be so intertwined with the patent issues that the evidence would, in large part, be material to both types of issues."). In essence, Infineon contends that its defense of equitable estoppel was sufficiently intertwined with the fraud case to justify an award of fees on its counterclaims as well. Rambus has not disputed the assertion that the equitable estoppel defense and the fraud claim are inextricably linked.

In addition to its attorneys' fees, Infineon contends that it should also be awarded its out-of-pocket expenses incurred in the preparation for and performance of legal services related to the suit. *See Mathis,* 857 F.2d at 757.

The Court is mindful that, "when attorney fees under 35 U.S.C. § 285 are awarded solely on the basis of litigation misconduct, the amount of the award must bear some relation to the extent of the misconduct." *Read Corp.,* 970 F.2d at 831. *See also Beckman Instruments,* 892 F.2d at 1553 (noting that the award of fees must be reflective of the severity of the misconduct). However, the award of fees in this case is not predicated on litigation misconduct alone. Instead, Rambus' bad faith began *prior* to the institution of this lawsuit because its prosecution of infringement suits was part of its plan to fraudulently obtain licensing royalties on JEDEC-compliant SDRAM products. At a minimum, Rambus was grossly negligent in asserting its position on claim con-

---

9. These fees consist of $3,097,402.77 in attorneys' fees and $907,388.12 in expenses for litigating the invalidity and non-infringement of Rambus' patents and $2,382,782.87 in attorneys' fees and $736,415.76 in expenses for the equitable estoppel defense and fraud counterclaim.

These totals amounts do not reflect fees incurred in litigating the actual fraud counterclaim respecting Rambus' conduct in connection with the DDR SDRAM JEDEC standard, for which judgment as a matter of law is to be entered in Rambus' favor. Although the Court also granted JMOL in favor of Rambus on Infineon's constructive fraud claim as well, the fees and expenses incurred in litigating that claim are no different than the fees for the actual fraud claim, therefore no adjustment has been made in the totals claimed by Infineon on its fraud counterclaim.

Additionally, these sums do not include fees to which Rambus originally objected because Infineon redacted portions of its invoices. Rather than waive its asserted attorney-client privilege by describing the work performed, Infineon has abandoned its request for fees on these matters.

Finally, these totals do not reflect the fees paid to the law firm of Slater & Matsil. Infineon claimed those fees as *damages* for its fraud claim. Had Infineon successfully proven the reasonableness of those fees, it could have recovered those fees. It cannot now circumvent its failure of proof at trial by requesting those fees under § 285 or under Virginia's law of fraud.

10. Infineon has not sought to recover fees in connection with those counterclaims on which it did not prevail.

struction and infringement, thus rendering its case frivolous. The litigation misconduct is simply *another* basis for a finding that this case is exceptional under § 285. Hence, it is not necessary to link Infineon's claimed fees to each asserted ground of litigation misconduct because Rambus' inequitable conduct and its frivolous litigation position each support the award of all the fees and expenses incurred by Infineon in and of themselves.

The inquiry next focuses upon the calculation of those fees. Without doubt, Infineon is the prevailing party in the patent infringement action and on its actual fraud claim. It is beyond question that Infineon has secured excellent results.[11] Where the prevailing party "has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation." *Mathis,* 857 F.2d at 755 (quoting *Hensley v. Eckerhart,* 461 U.S. 424, 435, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). Of course, calculation of fees under § 285 is governed by the precedent of the Federal Circuit. *Pharmacia & Upjohn Co. v. Mylan Pharm., Inc.,* 182 F.3d 1356, 1359 (Fed.Cir.1999). The Federal Circuit has approved use of a lodestar analysis in the calculation of reasonable attorneys' fees. *See Lam, Inc. v. Johns–Manville, Corp.,* 718 F.2d 1056, 1068 (Fed. Cir.1983). The lodestar is the number of hours reasonably expended multiplied by a reasonable hourly rate and usually supplies an objective basis on which to make an initial estimate of the value of the lawyer's services. *Hensley,* 461 U.S. at 433, 103 S.Ct. 1933. *See also Lam,* 718 F.2d at 1068 ("In determining the reasonableness of the award, there must be some evidence to support the reasonableness of, inter alia,

the billing rate charged and the number of hours expended.").

Although the Federal Circuit has not explicitly approved use of the factors listed in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974) as a basis for determining the reasonableness of the requested fees, those twelve factors have generally been accepted by federal courts in assessing the appropriate amount of attorneys' fees to be awarded. *See SunTiger, Inc. v. Scientific Research Funding Group,* 9 F.Supp.2d 601 (E.D.Va. 1998) (in assessing the reasonableness of fees under § 285, a federal district court "evaluates attorneys' fees petitions by applying traditional lodestar analysis, multiplying the number of hours reasonably spent on the litigation by a reasonable hourly rate, and then considering the twelve factors set forth in *Johnson.*"), *aff'd* 194 F.3d 1335 (1999).

The process to be followed is to multiply the reasonable hours spent by a reasonable rate, thereby producing the lodestar figure—the presumptively reasonable fee. Then, other considerations may lead to an upward or downward adjustment of the fee. *Hensley,* 461 U.S. at 434, 103 S.Ct. 1933; *Saleh v. Moore,* 95 F.Supp.2d 555, 566 (E.D.Va.2000), *aff'd* —— F.3d —— (table), 2001 WL 585085 (4th Cir.2001). Those considerations for upward or downward adjustment, cited in *Hensley,* are the factors outlined in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714. These now commonly-known *Johnson* factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case;

---

**11.** That is true notwithstanding the size of Infineon's monetary recovery because it defeated all infringement charges and secured

significant non-monetary relief on its fraud claim.

(5) the customary fee; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

However, as the Supreme Court made clear in *Hensley,* "many of these [*Johnson* ] factors usually are subsumed within the initial calculation of hours reasonably expended by a reasonable hourly rate." *Hensley,* 461 U.S. at 434 n. 9, 103 S.Ct. 1933. Of course, only the factors that apply to a particular case need to be addressed in determining the award of fees. *EEOC v. Service News Co.,* 898 F.2d 958, 965 (4th Cir.1990). In this case, the applicable factors are numbers 1, 2, 3, 5, 8 and 12. Mindful of these precepts, it is appropriate now to turn to assessing Infineon's fee application.

### a. Lodestar

 There is no dispute over the reasonableness of the rates charged by counsel for Infineon. There are a few objections, however, to the reasonableness of some of the time entries.[12]

### i. "Mixed" Time Entries

Rambus objects to a few so-called "mixed" entries in the Infineon time records in which the entry contains work that relates to antitrust, civil RICO and contract claims, on which Infineon did not prevail, as well as work related to the fraud claim, on which Infineon did prevail. These objections are not well-taken. To begin, it is clear that Infineon is making no claim for fees related solely to the unsuccessful antitrust, civil RICO or contract claims. (Declaration of Clifford Wilkins ¶ 4). Rambus recognizes this, but asserts that the so-called mixed entries are not compensable because some of the work therein reflected was attributable to claims which Infineon did not prevail. Infineon has properly demonstrated that the contested entries related to both the fraud claim, on which it did prevail, as well as to the claims on which it did not.

### ii. Redacted Entries

Infineon submitted several time records and invoices in which many of the entries were redacted to protect the attorney-client privilege or attorney work product. Infineon has withdrawn all such redacted entries from its fee request and that matter is no longer an issue.

### iii. Inability to Identify the Specific Law Firm to Which a Claimed Fee Relates

Rambus objected that the presentation of Infineon's fee request does not permit, or does not readily permit, determination of which fees are allocable to which law firms. Recognizing the problem created by the format of its presentation, Infineon, in its reply papers, has corrected this problem. Although imprecisely articulated in Rambus' objection, it appears that the principal ground for this complaint is the inability of Rambus to ascertain which of the fees are attributable to Slater & Matsil, whose fees Rambus objects to in their entirety. That issue is moot as respects a calculation of reasonable rates and hours because all of Slater & Matsil's fees are being excluded in any event.

---

**12.** *See generally* Rambus, Inc.'s Opposition to Infineon's Motion for Certain Attorneys' Fees and Expenses, pp. 23–25.

### iv. Tactical Coordination With Counsel in Other Actions Involving Rambus

There are a few entries of time devoted to coordinating with counsel for Hyundai Electronics Corporation and Micron Corp., both of whom are engaged in litigation with Rambus over the same patents that are at issue here and present similar issues of claim construction, fraud and inequitable conduct. Where, as here, other parties are engaged in litigation with a litigant's adversary in cases which involve the same issues, it contributes to overall efficiency and effective preparation and presentation of evidence if counsel, who share common interests, consult with one another. In fact, the usual course is to consult with lawyers opposing a common adversary. It is done with frequency by organized plaintiffs' and defense bars. So long as there is not an excessive claim for time spent consulting, fees of that sort are compensable. Infineon's claim for fees consulting with lawyers who also oppose Rambus in actions in other jurisdictions involving essentially the same patents and the same issues of fraud have been adequately documented as reasonably incurred here.

### b. The Novelty and Difficulty of the Questions Raised

The patent infringement issues are not *per se* novel. However, the extent to which Rambus based its claim construction on extrinsic evidence made litigation of the patent infringement issues unnecessarily complex. A considerable amount of attorney time was necessary to unravel the deceptive web of claim construction created by Rambus in the testimony of its expert witness, Dr. Huber. Thus, while the issue of claim construction is not novel *per se*, it was both novel and complex in the way it was raised here and it is entirely reasonable for Rambus to have to pay for the attorneys' fees necessary to unravel its meritless claim construction theories. Also, although the conduct of Rambus at JEDEC was unusual, conduct of that sort has been the subject of several reported decisions [13] and thus is not completely novel. However, here too, the manner in which Rambus effectuated, and then manipulated, the process to its benefit thereafter, was novel and access to the proof of deceit was made quite complex by Rambus, as explained in Section I.A.2 above. Rambus properly can be charged with the fees necessary to penetrate its web of deceit and to uncover the truth.

### c. The Customary Fee for Like Work and Attorneys' Fee Awards in Similar Cases

In this action, *Johnson* factor 5 and *Johnson* factor 12 are complementary. As Infineon demonstrated the amount of fees and expenses is consistent with, in fact less than, the amount spent by other parties in similarly complex patent cases (compare the fee request here with the Report of Economics Survey 1999 prepared for the American Intellectual Property Law Association). *See Yamanouchi Pharm. Co., Ltd. v. Danbury Pharmacal, Inc.,* 51 F.Supp.2d 302, 304 (S.D.N.Y.1999) ("In determining a reasonable rate, the court may refer to American Intellectual Property Law Association (AIPLA) surveys") (citing *Mathis,* 857 F.2d at 755). Further, the amount of fees and expenses sought by Infineon are consistent with what Rambus

---

**13.** *See Wang Lab., Inc. v. Mitsubishi Elec.,* 103 F.3d 1571, 1582 (Fed.Cir.1997); *Stambler v. Diebold, Inc.,* 11 U.S.P.Q.2d, 1709, 1714–15 (E.D.N.Y.1988), *aff'd* 878 F.2d 1445, 1989 WL 50518 (Fed.Cir.1989); *Potter Instr. Co. v. Storage Tech. Corp.,* 207 U.S.P.Q. 763, 769 (E.D.Va.1980), *aff'd on laches ground,* 641 F.2d 190 (4th Cir.1981).

has publicly reported about its expenses in this and other litigation involving its rights to the same patents. These factors teach that the request of Infineon is a reasonable one.

### d. The Amount in Controversy and the Results Obtained

The amount in controversy involves products which are central to Infineon's profitability. The royalties demanded by Rambus would, over the course of the short-term license proposed by Rambus, run into the hundreds of millions of dollars (as can be seen by multiplying Infineon's sales figures by the royalty percentages demanded by Rambus based on its licenses with other manufacturers and requested by Rambus in its pre-suit demand upon Infineon). Over the life of the patent, the royalties of the patent would be much greater. Thus, it is readily demonstrable here that the case was one of great importance, to both Infineon and Rambus. Additionally, because many of the same issues are presented in other cases to which Rambus is a party and the result here reasonably could be expected to provide a basis for either claim preclusion or issue preclusion in that other litigation, Rambus has conducted its offense and defense by employing a combination of blitzkrieg and Sherman-esque tactics—litigating to the extreme virtually every issue in the case—thereby demonstrating the significance of the case to Rambus and, at the same time, making the litigation of the case particularly expensive to Infineon.

The results obtained by Infineon are excellent. Here, Infineon prevailed entirely on the patent infringement claims and it prevailed upon the central counterclaim of fraud. The fact that Infineon did not prevail upon all of its claims does not in any way detract from the conclusion that the results obtained by Infineon were of great significance. *Saleh,* 95 F.Supp.2d at 576.

In assessing the results, one of the most important factors in any fee award is to ascertain the monetary results of the litigation. *Saleh,* 95 F.Supp.2d at 574 (citing *Farrar v. Hobby,* 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992)). The award of attorneys' fees is not measured solely, however, by the amount of the monetary recovery. *See City of Riverside v. Rivera,* 477 U.S. 561, 574, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986). *Rivera,* of course, involved an interpretation of fees awarded under 42 U.S.C. § 1988 in a civil rights case, but the public policies underlying § 285 are sufficiently analogous to those underlying the requirements of § 1988 that the same principles ought to apply.

In assessing the monetary results, the first point to be remembered is that, in prevailing on the patent infringement claims, Infineon has avoided the obligation to pay hundreds of millions of dollars or more in royalties. Even though the fraud award was nominal in amount, success on that claim entitled Infineon to an injunction to protect it from the predatory conduct reflected in Rambus' Business Plan and in its subsequent conduct in implementing the plan. That, though not precisely quantified by the record, can be considered a victory of immense proportions considering the expense involved in this litigation and the consequences of it to Infineon. It also must be remembered that the punitive award was ten times the amount allowed by statute. Thus, by any measure, Infineon has achieved substantial and excellent results in this litigation, and the fee award ought to reflect that great success.

Taking into account the reasonable rates, the hours reasonably expended, and the applicable *Johnson* factors, it is quite clear that Infineon is entitled to attorneys'

fees in the amount of $5,480,185.64 under § 285.

### e. Expenses

■ Rambus objects to the claim of expenses paid by Infineon, but not because particular expenses are unreasonable or unfounded.[14] Nor does Rambus argue that expenses are not within the reach of the term "attorneys' fees" within the meaning of 35 U.S.C. § 285, and clearly they are so considered. *See Central Soya,* 723 F.2d at 1578 ("The purpose of § 285 is, in a proper case and in the discretion of the trial judge, to compensate the prevailing party for its monetary outlays in the prosecution or defense of the suit."). Rather, Rambus makes a generalized objection to the award of expenses on the basis that the conduct in which it engaged is not of the ilk which permits an award of expenses within the attorneys' fee award under § 285. As explained in section II. B.1 above, that simply is not the case.

The nature of Rambus' bad faith and gross negligence in instigating this case, and the manner in which it was conducted, merits the award of both attorneys' fees and expenses. Therefore, Infineon is entitled to recover expenses in the amount of $1,643,803.88.

## II. Attorneys' Fees under Virginia Common Law

■ "The general rule in this Commonwealth is that in the absence of a statute or contract to the contrary, a court may not award attorney's fees to the prevailing party." *Prospect Dev. Co., Inc. v. Bershader,* 258 Va. 75, 515 S.E.2d 291, 300

(1999) (citing *Gilmore v. Basic Indus., Inc.,* 233 Va. 485, 357 S.E.2d 514, 517 (1987)). An exception to this rule in Virginia, however, is that "in a fraud suit, a chancellor, in the exercise of his discretion, may award attorney's fees to a defrauded party." *Id.* at 301. In crafting this exception, the Supreme Court of Virginia instructed that, "[w]hen deciding whether to award attorney's fees, the chancellor must consider the circumstances surrounding the fraudulent acts and the nature of the relief granted to the defrauded party." *Id.* By way of further guidance, the Court identified the factors on which the chancellor focused in deciding to exercise his discretion to award attorneys' fees to the prevailing plaintiff. Specifically, the Court held that:

> The evidence of record … demonstrates that the defendants engaged in callous, deliberate, deceitful acts that the chancellor described as a pattern of misconduct, which misled the Bershaders as well as other purchasers of property in the subdivision. Indeed, had the chancellor failed to award attorney's fees to the Bershaders, their victory would have been hollow because, as the chancellor observed:
>
>> "I'm simply unable to see the equity involved in [holding that the defendants] actually defrauded [the Bershaders but they are] going to have to spend … over $171,000 in attorneys' fees …. To say that this case was hotly contested by the defendants I think is something of an understatement. It was certainly hotly contest-

---

**14.** Infineon seeks to recover, *inter alia,* for travel and lodging expenses, overtime secretarial support, law clerk and legal assistant time, facsimile expenses, computer database legal research charges, long distance telephone charges, Fed Express charges, messenger charges, trial supply expenses and postage. All these charges appear to be appropriately requested. *See Stryker Corp. v. Intermedics Orthopedics, Inc.,* 898 F.Supp. 116, 126, 127 (E.D.N.Y.1995) (awarding law clerk and paralegal charges, and fees for copying, faxing, telephones and travel).

**690**

ed in all respects by the defense. And it was not a precise, surgical defense in this case. It was a global, comprehensive, all inclusive—basically defend everything and deny everything. And I'm not by saying that faulting the attorneys. That was the position taken by the defendants themselves.... It did take an enormous amount of effort by the complainants to prove their case in this situation."

*Id.*

■ Thus, *Bershader* teaches that the factors to consider in deciding whether to award prevailing party attorneys' fees include: (1) the record respecting the state of mind animating the fraud ("deliberate," "callous"); (2) the existence of a "pattern;" (3) the scope of the fraud ("misled the Bershaders as well as other" similarly situated persons); (4) whether fees are necessary to make the plaintiff's success meaningful and to ameliorate the effects of the fraud by removing the cost of redressing it from the defrauded prevailing party (absent the fees the "victory would have been hollow"); and (5) the nature of the defense mounted by the party who committed the fraud ("And, it was not a precise, surgical defense in this case. It was a global comprehensive, all inclusive-basically defend everything and deny everything [defense]"). Each of those factors warrant an award of attorneys' fees to Infineon.

As explained previously and in the opinions on the motions for judgment as a

matter of law and for injunctive relief, Rambus acted deliberately (pursuant to its Business Plan) and with callous disregard of its disclosure obligations and the rights of Infineon and other JEDEC members. The fraud involved a lengthy, multi-year pattern of conduct, not just an isolated incident. The fraud affected not just Infineon, but reached an entire segment of the semiconductor industry and many of its products. The award of fees is necessary to make Infineon's victory meaningful and to place upon Rambus the cost of remedying the pervasive consequences of the fraud, which the jury found it to have committed wantonly and maliciously. Finally, as explained previously, Rambus conducted a "global, comprehensive ... defend everything and deny everything" defense. It not only committed fraud but it sought to, and nearly succeeded in, covering up the proof of its misdeeds. The record here is that the cost (in attorneys' fees) of getting at the proof, presenting it and achieving success in court was great.

Therefore, under the calculus prescribed by *Bershader*, an award of attorneys' fees to Infineon as the prevailing party on its fraud claim is entirely appropriate.[15]

■ Rambus, does not challenge the amount of the claimed fee except to the extent addressed and disposed of in Section I.B.2.a, *supra*. Therefore, it is appropriate to award Infineon attorneys' fees of $2,382,782.87 in prosecuting its actual fraud counterclaim.[16]

---

15. In defending against Rambus' motion for judgment as a matter of law on the fraud verdicts, Infineon argued that *Bershader* also supported its argument that attorneys' fees could be recovered as an element of damages for fraud. As the Court held in connection with that motion, *Bershader* is more properly considered to be an award of attorneys' fees based on a party's status as the prevailing party, rather than damages to a defrauded plaintiff.

16. Infineon has also requested an award of its expenses of $736,415.76 under Virginia's common law of fraud. However, the only case Infineon cites to support its claim for fees and expenses, *Bershader*, does not indicate that expenses would be available under the common law of fraud—it speaks only in terms of attorneys' fees. Moreover, Infineon has failed to explain what expenses might be recoverable under Virginia common law and

## III. Inherent Equitable Power to Award Attorneys' Fees

 As one of the exceptions to the American rule against awarding attorneys' fees to the prevailing party, "a court may assess attorney's fees when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 23 F.3d 374, 378 (Fed.Cir.1994) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)).[17] Infineon asserts that the same factors which make this case "exceptional" under § 285, warrant the exercise of the court's equitable discretion to sanction Rambus for its vexatious litigation and bad faith.

As part of its request, Infineon asks that this Court not only award attorneys' fees but also allow Infineon to recover the fees incurred by its experts, which total $942,999.26.[18] However, not every case that qualifies as exceptional under § 285 will justify sanctions under the court's inherent equitable power. Moreover, in *Chambers*, the Supreme Court instructs that the "inherent equitable power" of the court should be used as a last resort to punish inequitable conduct. *See Amsted*, 23 F.3d at 379 ("*Chambers* admonishes trial courts to first employ statutory and rules sanctions. Thus, courts should only resort to further sanctions when misconduct remains unremedied by those initial tools ...") (citing *Chambers*, 501 U.S. at 50, 111 S.Ct. 2123).

"[W]hen there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the [statutes or] rules, the court ordinarily should rely on the [statutes or] rules rather than the inherent power." *Id.* (quoting *Chambers*, 501 U.S. at 50, 111 S.Ct. 2123). "The court should resort to its inherent power only where the rules or statutes do not reach the 'acts which degrade the judicial system.'" *Id.* at 378 (quoting *Chambers*, 501 U.S. at 41–42, 111 S.Ct. 2123). Here, the award of attorneys' fees under 35 U.S.C. § 285 and under Virginia's common law of fraud adequately sanctions Rambus for its bad faith in bringing the patent suit and for its fraudulent behavior which infected JEDEC's standard-setting process. Because the exercise of a district court's inherent equitable power should be used only as a last resort where other statutes, rules or decisions do not control, and because 35 U.S.C. § 285 and the Virginia rule in *Bershader* control here, the Court declines to exercise the equitable power to implement the award of expenses by permitting recoupment of nearly $1 million in expert witness fees.

## CONCLUSION

For the reasons set forth above, Infineon is awarded a total of $7,123,989.52 in attorneys' fees and expenses under 35 U.S.C. § 285 and $2,382,782.87 in attorneys' fees for prevailing on its fraud counterclaim. Because the attorneys' fees awarded under § 285 and as a prevailing party under Virginia's law of fraud are

---

whether those expenses may differ from the expenses available under § 285 or the Federal Rules of Civil Procedure. The request for expenses under Virginia's common law of fraud is, therefore, denied.

**17.** The other two exceptions are (1) the "common fund exception," which derives not from a court's power to control litigants, but instead allows a court to award attorney's fees

to a party whose litigation efforts directly benefit others, and (2) a sanction for the willful disobedience of a court order. *Amsted*, 23 F.3d at 378.

**18.** Section 285 does not allow for the award of expert witness fees. *See Amsted*, 23 F.3d at 377.

duplicative, the total amount awarded is $7,123,989.52. Infineon's request for an award of expert fees under the inherent equitable of the Court is denied.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.